IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BLACKBIRD TECH LCC d/b/a<br>BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>SERVICE LIGHTING AND ELECTRICAL<br>SUPPLIES, INC. d/b/a 1000BULBS.COM,<br>and PRECISION LIGHTING AND<br>TRANSFORMER, INC.,<br><br>Defendants. | Civil Action No. 15-53-RGA |
| BLACKBIRD TECH LCC d/b/a<br>BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>ELB ELECTRONICS, INC.,<br><br>Defendant. | Civil Action No. 15-56-RGA |
| BLACKBIRD TECH LCC d/b/a<br>BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>ETi SOLID STATE LIGHTING INC.,<br><br>Defendant. | Civil Action No. 15-57-RGA |

| | |
|---|---|
| BLACKBIRD TECH LCC d/b/a<br>BLACKBIRD TECHNOLOGIES,<br><br>        Plaintiff,<br><br>    v.<br><br>FEIT ELECTRIC COMPANY, INC.,<br><br>        Defendant. | Civil Action No. 15-58-RGA |
| BLACKBIRD TECH LCC d/b/a<br>BLACKBIRD TECHNOLOGIES,<br><br>        Plaintiff,<br><br>    v.<br><br>GREEN CREATIVE LLC,<br><br>        Defendant. | Civil Action No. 15-59-RGA |
| BLACKBIRD TECH LCC d/b/a<br>BLACKBIRD TECHNOLOGIES,<br><br>        Plaintiff,<br><br>    v.<br><br>LEDWHOLESALERS.COM INC.,<br><br>        Defendant. | Civil Action No. 15-60-RGA |

| | |
|---|---|
| BLACKBIRD TECH LCC d/b/a BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>HOME EVER INC. d/b/a LIGHTING EVER INC.,<br><br>Defendant. | Civil Action No. 15-61-RGA |
| BLACKBIRD TECH LCC d/b/a BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>PLUSRITE CORP. d/b/a naturaLED<br><br>Defendant. | Civil Action No. 15-62-RGA |
| BLACKBIRD TECH LCC d/b/a BLACKBIRD TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>3NLED LIGHTING USA INC.,<br><br>Defendant. | Civil Action No. 15-63-RGA |

3

BLACKBIRD TECH LCC d/b/a
BLACKBIRD TECHNOLOGIES,

Plaintiff,

v.

KOBI ELECTRIC INC.,

Defendant.

Civil Action No. 15-64-RGA

MEMORANDUM ORDER

Presently before the Court is a dispute between Plaintiff Blackbird Tech LLC ("Blackbird") and Defendants over the terms of proposed protective orders to govern the use of confidential information produced or otherwise provided in these related cases. While Blackbird and Defendants agree that a protective order should be entered in these cases, they disagree on the degree of access that should be afforded to Blackbird's in-house counsel and the scope of the proposed patent prosecution bar. I have considered the parties' relevant letter briefs and supplemental affidavits. (D.I. 36, 37, 45-1, 45-2, 45-3, 47).[1] The Court held oral argument on May 5, 2016. For the reasons that follow, I will order the parties to submit a proposed protective order complying with the restrictions set forth in this order.

Under Federal Rule of Civil Procedure 26(c)(1), "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." FED. R. CIV. P. 26(c)(1). Included in the protections contemplated by Rule 26(c) is a protective order "requiring that a trade secret or other confidential research,

---

[1] All references to the docket refer to Civil Action No. 15-53-RGA.

4

development, or commercial information not be revealed or be revealed only in a specified way . . . ." FED. R. CIV. P. 26(c)(1)(G). Inherent in a court's power under Rule 26 is the ability to restrict an individual attorney's access to a trade secret or other confidential information when there is "an unacceptable opportunity for inadvertent disclosure." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984).[2] In determining whether a protective order should bar a party's attorney access to information, the Federal Circuit has explained that "[t]he factual circumstances surrounding each individual counsel's activities, association, and relationship with a party, whether counsel be in-house or retained, must govern any concern for inadvertent or accidental disclosure." *Id*. "[W]here in-house counsel are involved in competitive decisionmaking, it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed." *Id.*; *see also In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) ("[T]he counsel-by-counsel determination should turn on the extent to which counsel is involved in 'competitive decisionmaking' with its client.").

The Federal Circuit defined competitive decisionmaking as "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel*, 730 F.2d at 1468 n.3. "Although pricing and product design were listed as specific exemplars of activity involving competitive decisionmaking, subsequent opinions have recognized that [there are other] activities that might implicate or involve competitive decisionmaking." *Deutsche Bank*, 605 F.3d

---

[2] As numerous courts have remarked, the inquiry "is not directed at the attorney's ethical standards," because it focuses on the likelihood of *inadvertent* disclosure. *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, 2008 WL 5634214, at *2 n.4 (E.D. Tex. Mar. 14, 2008).

5

at 1378–79. A number of district courts have found that individuals who are heavily-involved in businesses that "revolve[] around the acquisition, enforcement (through litigation), and licensing of patents" should be considered competitive decisionmakers for purposes of this inquiry. *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, 2008 WL 5634214, at *5 (E.D. Tex. Mar. 14, 2008); *see also Apeldyn Corp. v. AU Optronics Corp.*, 2012 WL 2366537, at *1 (D. Del. June 20, 2012).

Even if a district court is satisfied that a risk of inadvertent disclosure or misuse exists, "the district court must balance this risk against the potential harm to the opposing party from restrictions imposed upon that party's right to have the benefit of counsel of its choice." *Deutsche Bank*, 605 F.3d at 1380. "In balancing these conflicting interests the district court has broad discretion to decide what degree of protection is required." *Id.* A party seeking a protective order, as well as a party seeking to include a patent prosecution bar within a protective order, must show good cause for its issuance. *See id.* at 1378. The requirement that the surrounding facts be analyzed on a counsel-by-counsel basis also extends to a court's assessment of whether to institute a patent prosecution bar. *See id.* at 1379–80. "[A] party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar, the scope of activities prohibited by the bar, the duration of the bar, and the subject matter covered by the bar reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id.* at 1381.

These cases present a unique set of circumstances that complicates the protective order inquiry.[3] Blackbird describes its business as "a new model for individual inventors and small

---

[3] I suggest that these factual circumstances are unique, primarily because no counsel for any of the parties, upon questioning at oral argument, were able to direct the Court to a prior dispute where a company's officers and principals were simultaneously serving as its primary litigation counsel.

companies to monetize their intellectual property." (D.I. 36-1 at 71). "Blackbird achieves this goal by acquiring patents and litigating on behalf of itself, using experienced patent litigators that are directly employed by Blackbird instead of outside counsel, at a great cost savings." (D.I. 45-1 at 4). Blackbird describes the acquisition of patents as being "essential" to its business. (D.I. 45-2 at 4). "Blackbird generally acquires patents from the previous patent owners in exchange for a contractual promise to perform a thorough pre-suit investigation into potential infringement, and if litigation is initiated, to share a percentage of any eventual revenue received from litigating the patent with the previous patent owner." (*Id.*). An important part of Blackbird's business model is to maintain "a diverse portfolio of patents and not to be concentrated in one technological area." (*Id.*). Blackbird has only six full-time employees and five part-time employees. (D.I. 45-1 at 4). Blackbird has directly "hired a number of experienced patent litigators" essentially to achieve cost savings without sacrificing the quality of counsel. (*Id.* at 5). In its own words, "Blackbird is not designed, from a financial standpoint, to litigate through outside counsel." (*Id.*). Accordingly, aside from local counsel, Blackbird intends to litigate these cases entirely through its in-house lawyers. (D.I. 37 at 1–3). Thus far, three Blackbird in-house lawyers have entered appearances in these cases: Wendy Verlander, Chris Freeman, and Sean Thompson.

Ms. Verlander is Blackbird's President, CEO, and co-founder. (D.I. 45-1 at 4). She has over 20 years of patent litigation experience, making her the most experienced patent litigator at Blackbird. (*Id.* at 5). Ms. Verlander describes her primary role with the company as "to supervise litigation," having "oversight over all patent litigation currently pending and potential future litigation." (*Id.* at 4, 6). She has "been active in the litigation of these cases and [] plan[s] to remain very involved in the litigation of these cases," is "involved in settlement discussions"

7

in these cases, and "plan[s] to participate in any ADR proceedings." (*Id.* at 6). Ms. Verlander's role in Blackbird's acquisition of patents involves reviewing lists of potential acquisition targets prepared by Blackbird's Patent Analysis Group, assessing Blackbird's potential for success in litigating those patents, and essentially giving the final say, in conjunction with Mr. Freeman, on whether Blackbird should acquire a particular patent. (*Id.* at 7). She describes her involvement with "the acquisition side of Blackbird's business [as being] far less important to the company than [her] role in the litigations." (*Id.*). Blackbird hires outside counsel for its limited amount of patent prosecution, and this work is supervised by the counsel in its Patent Analysis Group, "who has no access to confidential information from litigations." (*Id.* at 8). Ms. Verlander describes her role with regard to patent prosecution as "a very high level supervisory role." (*Id.*).

Chris Freeman is the Vice President, Head of Litigation, and co-founder of Blackbird. (D.I. 45-2 at 4). He also describes his primary role in the company as "to supervise litigation." (*Id.*). Mr. Freeman's role at Blackbird with regard to litigation, acquisition, and prosecution is largely co-extensive with that of Ms. Verlander, as described above, although Mr. Freeman also notes that he is lead counsel in some of Blackbird's litigations and handles day-to-day business operations. (*Id.* at 4–8). He also states that, while he is registered to practice before the PTO, he has "never prosecuted any patents, and [does] not intend to at Blackbird." (*Id.* at 8). Mr. Freeman began these related cases as lead counsel, although that role was later taken over by Sean Thompson. (*Id.* at 6).

Sean Thompson is a Senior Litigation Counsel at Blackbird and is lead counsel in these cases. (D.I. 45-3 at 4). He is "responsible for handling all aspects of Blackbird's patent litigations, from presuit analysis through trial and appeal." (*Id.*). Mr. Thompson is not involved

8

in patent acquisition or patent prosecution. (*Id.*). Mr. Thompson is involved in the licensing of Blackbird's patents, though only in the context of litigation. (*Id.*).

Defendants seek to exclude Blackbird's in-house attorneys from being given access to information designated as "Highly Confidential" or "Highly Confidential—Subject to Prosecution Bar." (D.I. 36 at 1). Defendants assert that Blackbird's in-house counsel "will likely be unable to compartmentalize information regarding Defendants' proprietary technical and financial information when they are engaged in company management and strategy, analyzing patents for acquisition and assertion, prosecuting the scope of ongoing patent applications, or negotiating the terms of a settlement or license." (*Id.* at 2; *see also* D.I. 47 at 2). Defendants' fear is that disclosing its confidential information to Blackbird's in-house attorneys would "allow Blackbird to tailor its patent assertion business model to target Defendants in future actions." (D.I. 36 at 3).

Blackbird argues that its in-house lawyers should be able to access Defendants' highly confidential information because, without such information, Blackbird would be prevented from pursuing these cases within its low-cost litigation business model, which "will make continued litigation of these cases extremely difficult." (D.I. 37 at 1–3). Blackbird contends that its in-house lawyers function in the same way as traditional outside counsel and that any legitimate concerns about the disclosure or misuse of highly confidential information can be addressed through protective measures, such as the prosecution bar to which it is agreeing to be bound. (*Id.* at 2). Blackbird further asserts that it "does not compete in the marketplace with the defendants and its portfolio is not focused on any particular technology area." (*Id.*). Finally, Blackbird argues that even if there is a risk of inadvertent disclosure, it is far outweighed by the harm it would incur from restrictions on its right to have litigation counsel of its choice. *See id.* at 3.

9

As to the prosecution bar, the parties' dispute boils down to two issues: its scope and triggers. While Blackbird does not oppose a prosecution bar, Defendants seek to exclude reviewing attorneys from participating in activities involving the "acquisition of a patent or patent application" as well, reflecting their concerns with Blackbird's acquisition-based business model. (D.I. 36 at 3). Blackbird wants to limit the bar just to prosecution activities, arguing that "patent acquisition does not implicate concerns of altering claim scope." (D.I. 37 at 1 n.2). Blackbird also seeks to limit the prosecution bar's applicability to the receipt of "proprietary technical information *relating to products not on sale as of the date of the entry of this Protective Order*." (D.I. 37-2 at 5; D.I. 37 at 1–2 n.2 (emphasis added)). Defendants do not want to include the temporal limitation proposed by Blackbird, and seek to include the broader language, "proprietary technical information, the disclosure of which during patent acquisition or prosecution activities would create a risk of serious injury to the business or competitive interests of the producer." (D.I. 37-2 at 5–6; D.I. 36 at 3).

Based upon the above-discussed precedent, the Court must weigh the risk of inadvertent disclosure and misuse of Defendants' confidential information with the harm Blackbird would suffer from being unable to use its counsel of choice in these cases. *See Deutsche Bank*, 605 F.3d at 1380. First, I do think that Ms. Verlander and Mr. Freeman are competitive decisionmakers. Ms. Verlander and Mr. Freeman are essentially the officers and principals of Blackbird, a business whose main practice is acquiring patents and asserting them in litigation. They oversee and manage all aspects of Blackbird's litigation strategy, take active roles in litigating specific cases, and appear to have the final say in both company management and case resolution. Most importantly, although they do not handle the early stages of due diligence involved in Blackbird's patent acquisition process, Ms. Verlander and Mr. Freeman essentially

10

have the final say on what patents Blackbird will acquire and assert in subsequent litigations. (D.I. 45-1 at 7; D.I. 45-2 at 7). Although Blackbird attempts to minimize the roles of Ms. Verlander and Mr. Freeman in Blackbird's patent acquisition process, I think their involvement is more than sufficient to create a considerable risk that they will "have a difficult time compartmentalizing [their] knowledge" of Defendants' financial and technical information when making the final say on what patents to acquire and assert. *See United States v. Dentsply Int'l, Inc.*, 187 F.R.D. 152, 159–60 (D. Del. 1999).

I do think that Mr. Thompson's role is to perform activities more akin to those of traditional outside counsel. While his role is less concerning than the roles of Ms. Verlander and Mr. Freeman, Mr. Thompson is still involved in negotiating the terms of licensing agreements as part of settling lawsuits (D.I. 45-3 at 4), an activity that some courts have deemed to be competitive decisionmaking when performed by in-house counsel. *See, e.g., Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 530 (N.D. Cal. 2000) ("[In-house counsel's] involvement in licensing through litigation constitutes competitive decisionmaking, because her advice and counsel necessarily affect licensing decisions."). Given Blackbird's small size and closely-held nature, Mr. Thompson appears to work closely with Ms. Verlander and Mr. Freeman, which would exacerbate the potential for inadvertent misuse or disclosure were the Court to only allow Mr. Thompson to access Defendants' confidential information. *See id.* (explaining that the fact that in-house counsel reported directly to competitive decisionmakers "exacerbated" inadvertent disclosure concerns, because counsel's responsibility to provide advice to these decisionmakers "pose[d] a serious risk of providing advice and counsel based upon protected information"). Based upon Blackbird's position that it would be "devastating to Blackbird" if either Ms. Verlander or Mr. Freeman "were categorically excluded from meaningful participation in

11

litigation activities," that solution clearly would not address their concerns anyway.[4] (D.I. 45-1 at 4).

Blackbird's argument that its principals are not competitive decisionmakers because it is not a direct competitor of any Defendants rings hollow. In bringing a patent infringement action, Blackbird is asserting that Defendants have encroached upon its exclusive right to exploit a specific technology in the marketplace. In other words, Blackbird is essentially declaring that Defendants are improperly competing with it in the marketplace, in contravention of Blackbird's patent monopoly on that technology. Blackbird cannot have it both ways. For Blackbird to seek to hold Defendants liable for improperly competing in the marketplace and turn around and say it in no way competes with Defendants is too convenient, and other courts have similarly given little weight to such arguments. *See, e.g., ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, 2008 WL 5634214, at *6 (E.D. Tex. Mar. 14, 2008) ("[I]t is somewhat disingenuous to argue [Plaintiff] is not Defendants' competitor simply because [Plaintiff] is in the business of acquiring and enforcing patents while Defendants manufacture and design automobiles. Plaintiff and Defendants all seek to utilize, in one manner of another, intellectual property as part of a business model for pecuniary gain.").

Given these three Blackbird lawyers' roles as competitive decisionmakers, I think there is a concrete, particularized risk of inadvertent disclosure and misuse here. To give Blackbird's competitive decisionmakers access to Defendants' confidential technical and financial information would raise the specter of prosecuting or acquiring patents that read on Defendants' products. *See, e.g., ST Sales Tech.*, 2008 WL 5634214 at *5 (observing that counsel's involvement in patent acquisition for various patent-holding entities put him in position to

---

[4] In any event, without a showing of safeguards in place to protect against inadvertent disclosure, I do not think that allowing only Mr. Thompson to access confidential information would be an acceptable solution at this time.

12

purchase or otherwise "seek out certain patents and then propose claim constructions that read on Defendants' known use of the allegedly infringing systems."). Although I presume the good faith of Blackbird's counsel, once such confidential information is disclosed, the bell cannot be unrung. *See In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) ("It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." (internal quotation marks omitted)). At the same time, in crafting the appropriate remedy, it is significant that the only competitive harm Blackbird realistically poses to any of the Defendants arises out of litigation. Indeed, in their letter briefs, Defendants' largely direct their concerns to the possibility that Blackbird could "tailor its patent assertion business model to target Defendants in future actions." (D.I. 36 at 3; *see also* D.I. 47 at 2 (asserting that Ms. Verlander and Mr. Freeman might take into account Defendants' confidential information "when advising stakeholders about their investment in litigation against the Defendants and the acquisition of any patents to assert against the Defendants in the future.")). Accordingly, if the threat of future litigation is taken off the table, there is significantly less likelihood of harm to Defendants.

With regard to the other side of the balancing inquiry, I do think Blackbird would suffer harm if prevented from using the attorneys of its choice, even if those attorneys are its own. I take at face value Blackbird's assertion that its low-cost litigation model allows it to enforce patents that might not otherwise justify the high costs of hiring outside patent counsel. (D.I. 37 at 1–3; D.I. 45-1 at 4–5). Thus, I credit Blackbird's assertion that denying its in-house litigators the ability to meaningfully participate in these cases would leave it with no alternative but to shut down the litigation. While I acknowledge that this is a problem of Blackbird's own creation, requiring Blackbird to retain outside counsel would constitute some level of harm to Blackbird

13

that I must balance in crafting an appropriate remedy. *See Affymetrix, Inc. v. Illumina, Inc.*, 2005 WL 1801683, at *1–2 & n.3 (D. Del. July 28, 2005) (taking into account that Plaintiff intended to have its in-house "Litigation Unit" serve as trial counsel without retaining outside counsel and that Plaintiff "incurred significant expense in setting up its Litigation Unit so that it would not have to engage outside counsel to represent it in patent actions").

Case law regarding protective orders in patent litigation, however, has largely evolved in the context of parties being represented by both in-house and outside counsel. Where parties are represented by outside counsel, courts have little trouble balancing the harms in protective order disputes, often readily concluding that the outside counsel of a party's choice can adequately represent its interests even if in-house counsel is precluded from viewing confidential information. *See, e.g., ST Sales Tech*, 2008 WL 5634214, at *8 ("Courts have found time and again that requiring a party to rely on its competent outside counsel does not create an undue or unnecessary burden."); *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000) (same). In effect, Blackbird argues for precedent to be adapted to this new factual scenario, its low-cost litigation business model, rather than basing its business model on available precedent. While the Court is not aware of any case law addressing this precise factual scenario, there is precedent for allowing in-house counsel access to confidential information in patent cases where there is sufficient need and the risks of inadvertent disclosure can be minimized. *See, e.g., Koninklijke Philips N.V. v. Amerlux, LLC*, 2016 WL 917898, at *1–2 (D. Mass. Mar. 10, 2016) ("[T]he risk of inadvertent disclosure presented by the three in-house counsel in question is attenuated and outweighed by Philips's interest in facilitating access by its counsel most involved in this case to the information necessary to press its claims."); *Affymetrix,* 2005 WL 1801683, at *2 ("[T]he Court is persuaded in the circumstances of this case, that access under the

14

protective order should be afforded to [Plaintiff's] Litigation Unit. Although the Litigation Unit has an 'in-house label, [Plaintiff] has implemented numerous safeguards to protect against inadvertent disclosure . . . .").

In crafting the appropriate remedy, I am mindful of the considerable interests of both parties here and the broad discretion I have to decide what degree of protection is required. *See Deutsche Bank*, 605 F.3d at 1380. Accordingly, I think that a prosecution bar and covenant not to sue these Defendants on after-acquired patents in the lighting industry would adequately protect Defendants' interests while allowing Blackbird to prosecute these actions with its in-house lawyers. First, while the record suggests that Blackbird's attorneys are unlikely to be involved in prosecuting patents, it remains a possibility that should be foreclosed in order to protect Defendants' interests. Given the affidavits from relevant Blackbird counsel saying that they do not currently and do not intend to engage in prosecution activity, and that acquisition is the heart of Blackbird's business, this provision will create little burden on Blackbird. I will also reject Blackbird's effort to limit the scope of the prosecution bar to information relating to products not on sale as of the date of the entry of this Protective Order. (D.I. 37-2 at 5–6). Blackbird seems to pluck this limitation out of thin air, yet offers no compelling justification for it. Instead, Defendants' description of what triggers the bar will govern. Thus, the protective order should prevent Blackbird's three in-house attorneys of record in this case from being involved in any prosecution activity related to lighting technology, for the time period already agreed upon in the protective order (the pendency of the case and one year after the conclusion of the litigation). (D.I. 37-2 at 13–14). Implicit in this bar is that these counsel cannot direct outside patent

15

prosecution counsel to prosecute patents relating to lighting technology for the relevant time period.[5]

Second, the Court will require that Blackbird agree to a covenant not to sue any of these Defendants for infringement of patents involving lighting technology that are acquired during the time between the entry of the protective order and one year after the conclusion of the litigation. To be clear, if Blackbird acquires a patent on any lighting technology[6] during the restricted time period, it may never assert that specific patent against these Defendants.[7] Given Blackbird's acquisition-based business model, the possibility that Blackbird could acquire patents that read on Defendants' products is the most immediate, tangible concern raised by Defendants. With these restrictions in place, Blackbird's counsel of record in these cases should be able to receive Defendants' confidential information and participate in litigating these cases, resolving the dispute on page 10 of the redlined protective order. (D.I. 37-2 at 10).

I am mindful that this resolution imposes limitations on Blackbird. However, I think these limitations are a necessary byproduct of Blackbird's business model, in particular, its desire to have its officers litigate cases. When attorneys serve the dual role of competitive decisionmaker and litigation counsel, however, as Ms. Verlander and Mr. Freeman do here, courts must consider both of those roles and cannot simply ignore the competitive decisionmaker

---

[5] Ms. Verlander admits that she may have some involvement in engaging outside law firms to handle prosecution activities, even if "only in a very high level supervisory role." (D.I. 45-1 at 8). Accordingly, if she could direct outside counsel to prosecute patents in this technological area, the prosecution bar would do little to address the concerns raised by Defendants here.

[6] For the prosecution bar and covenant not to sue to have any meaningful teeth in this scenario, I think they must apply to all "lighting technology." Constraining these limitations to the "technology of the patent-in-suit" would provide little clarity and would leave open a much greater possibility of competitive harm to Defendants. While "lighting technology" may not itself be the most precise formulation, the point is that this provision should be broadly construed in favor of Defendants.

[7] The covenant will apply equally to Defendants' customers. With regard to Defendants' third-party suppliers, the covenant should apply, but only in a more limited sense. The covenant should only protect Defendants' third-party suppliers from infringement actions (based on after-acquired patents) that involve the accused products at issue in this case.

aspect. For this reason, I cannot approve Blackbird's request for *carte blanche* access to Defendants' confidential information without affording stronger protections for Defendants. Moreover, because Blackbird purposefully diversifies its patent portfolio and does not target any particular industry or technology by design, temporary limitations on its patent assertion activities against these Defendants should not be unnecessarily harmful to its business.[8] Likewise, while there is some risk that Blackbird's counsel could inadvertently use one Defendants' confidential information in its concurrent litigation with the other Defendants, resulting in competitive harm, the situation is no different substantively, at least with these restrictions in place, than the risks involved in any series of related cases where one plaintiff, represented by the same outside counsel, sues multiple defendants for infringement of the same patents. Accordingly, I think that allowing Blackbird's in-house counsel to go forward in this litigation with the above-described restrictions in place is an approach that appropriately balances the considerable interests of all parties involved.

Now, this 18 day of May, 2016, **IT IS HEREBY ORDERED THAT**:

The parties shall, within five (5) days from the date of this Order, jointly submit a Proposed Protective Order consistent with the Court's opinion set forth herein.

*/s/ Richard G. Andrews*
United States District Judge

---

[8] In fact, Blackbird's characterization of its patent acquisition process suggests that it would take an unlikely series of events for Blackbird to end up acquiring additional patents on the same technology. (D.I. 45-1 at 6–7; D.I. 45-2 at 6–7). Taking this description of the acquisition process at face value, it difficult to see how these limitations inflict any meaningful harm on Blackbird beyond mere speculation.

17