# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BLACKBIRD TECH, LLC,      )
                          )
          Plaintiff,      )   C.A. No. 15-53-RGA
                          )
v.                        )
                          )
SERVICE LIGHTING AND      )
ELECTRICAL SUPPLIES,      )
INC., et al.,             )
                          )
          Defendants.     )

Thursday, May 5, 2016
2:00 p.m.
Courtroom 6A

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge

APPEARANCES:

STAMOULIS & WEINBLATT, LLC
BY:  STAMATIOS STAMOULIS, ESQ.

          -and-

BLACKBIRD TECHNOLOGIES
BY:  SEAN K. THOMPSON, ESQ.

                    Counsel for the Plaintiff

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

---

2

1   A P P E A R A N C E S   C O N T I N U E D :

2

3   POTTER, ANDERSON & CORROON, P.A.
    BY:  PHILIP A. ROVNER, ESQ.
    BY:  JONATHAN A. CHOA, ESQ.
4   BY:  ALAN R. SILVERSTEIN, ESQ.

5        Counsel for the Defendants,
         Plusrite, Green Creative, ETI,
6        Precision Service Lighting, Kobi

7

8   MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
    BY:  MICHAEL FLYNN, ESQ.

9        Counsel for the Defendants,
         Amazon, ELB and Feit
10

11  RICHARDS, LAYTON & FINGER
    BY:  KELLY FARNAN, ESQ.

12       Counsel for the Defendants,
13       Home Ever, 3NLED Lighting and
         LEDwholesalers.com
14

15
16
17
18
19
20
21
22
23
24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

---

3

1   THE COURT:  So this is Blackbird
2   Tech versus Service Lighting and Electrical
3   Supplies, civil action number 15-53 plus about
4   10 other cases that are all related.  Mr.
5   Stamoulis.
6        MR. STAMOULIS:  Good afternoon,
7   Your Honor. Stam Stamoulis here on behalf of
8   Blackbird. With me is Sean Thompson and Wendy
9   Verlander.
10       THE COURT:  All right. Good
11  afternoon to you all.  Mr. Rovner.
12       MR. ROVNER:  Good afternoon, Your
13  Honor. Phil Rover from Potter Anderson. I'm
14  with my colleagues, Jonathan Choa and Alan
15  Silverstein. And we're representing Defendants
16  in the following cases, 15-053, 15-057, 15-059,
17  15-062 and 15-064.
18       THE COURT:  All right. Mr. Flynn.
19       MR. FLYNN:  Good afternoon, Your
20  Honor. Michael Flynn from Morris Nichols and
21  I'm representing today Amazon.com in civil
22  action 15-054, ELB Electronics in 15-056 and
23  Feit Electric Company in 15-058.
24       THE COURT:  All right. Thank you,

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

---

4

1   Mr. Flynn. Ms. Farnan.
2        MS. FARNAN:  Good afternoon, Your
3   Honor. Kelly Farnan from Richards, Layton &
4   Finger on behalf of LEDwholesalers.com, Inc., in
5   15-60, Home Ever, Inc., in 15-61 and 3NLED
6   Lighting USA, Inc., in 15-63. We have filed a
7   motion to withdraw as counsel on behalf of 3NLED
8   Lighting but that's scheduled for a later date,
9   but we are here today on behalf of them.
10       THE COURT:  And which case is
11  that? You told me the name, but what's the
12  number?
13       MS. FARNAN:  15-63.
14       THE COURT:  Okay. And I scheduled
15  a hearing on that motion to withdraw, right?
16       MS. FARNAN:  That's correct, Your
17  Honor. I believe it's May 16th.
18       THE COURT:  Okay. Thank you. All
19  right. I guess probably makes sense to hear
20  from the Defendant, because you're the one who
21  wants to have more protections. Is that you,
22  Mr. Rovner?
23       MR. ROVNER:  Yes, Your Honor. I
24  don't know if it -- I guess it would be defined

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**5**

1  as more protections. I would better define it
2  as we want protections.
3        THE COURT: Okay.
4        MR. ROVNER: As opposed to no
5  protections.
6        THE COURT: Okay. Well, you come
7  forward. How many of the Defendants, Mr.
8  Rovner, if you know, are publically traded
9  companies?
10       MR. ROVNER: I don't know. I
11  don't think many of them.
12       THE COURT: Okay. All right. And
13  in terms of the technical and financial
14  information that they are likely to produce, is
15  there one category or the other that they are
16  more concerned about in terms of who you want to
17  restrict the access to?
18       MR. ROVNER: Well, the way -- it's
19  a good question, because one of the points that
20  Blackbird has made in its papers is that this is
21  a case, pretty simple case, it's about light
22  bulbs, they'll look at the light bulbs, they'll
23  say that it's all they'll really need. It's a
24  very simple case and we're sort of blowing this

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**6**

1  out of proportion. If they only wanted light
2  bulbs, wanted some samples, we wouldn't be here.
3  But what they want -- and I'm just going to read
4  from their own requests for production, number
5  one. And this is what they want from the
6  Defendants. Documents sufficient to show the
7  design, development, structure and operation of
8  each accused product, including, but not limited
9  to project proposals, inventor notebooks,
10  invention disclosures, revision histories, flow
11  charts, drawings, specifications, white papers,
12  computer simulations, logic diagrams, technical
13  documentation, functional documentation,
14  operations manuals and user documentation.
15       So for them to say to you, oh,
16  we'll look at light bulbs, that's not what
17  they're asking for. So we are requiring, in
18  addition to producing our core technical
19  documents, which we did, with a limitation that
20  their in-house counsel will not see it until
21  this issue gets resolved, we produced them to
22  Mr. Stamoulis. We have requests for production
23  that are due, responses are due today, and we
24  are required to go and look for these materials.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**7**

1  So there is a lot in terms of what would be
2  proprietary here in terms of when you asked for
3  technical documentation.
4        THE COURT: So you say there's a
5  lot that's proprietary. You know, I presume
6  this is not about actually what kind of circuit
7  makes a light bulb. What kind of technical
8  documentation do you have that is real
9  sensitive?
10       MR. ROVNER: Well, the way -- I
11  don't want to say too much because we have yet
12  to get their infringement contentions, so I
13  don't really want to tip our hand.
14       THE COURT: Well, you're saying
15  this at a very high level.
16       MR. ROVNER: Well, the schematics
17  of how these things work is really what's
18  important to us and when they say technical
19  documentation, that would involve the way these,
20  you know, would touch upon what they're accusing
21  and how they're accusing our products to be
22  infringing and I know I'm being general, but I'm
23  sort of doing it on purpose.
24       THE COURT: All right. Well, I

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**8**

1  mean, schematics, I can see that.
2        MR. ROVNER: And we produced
3  schematics. I can't speak for all of the
4  Defendants, but some of the Defendants for whom
5  I represent have produced schematics in their
6  core technical documents, again, produced only
7  to Mr. Stamoulis by agreement.
8        THE COURT: All right. And in
9  terms of financial documents, which I presume
10  are perhaps not immediately at issue here, the
11  sensitivity of financial documents is if these
12  are not publically held companies, then among
13  other things I guess the Plaintiff learns
14  whether you are a worthwhile target for
15  litigation?
16       MR. ROVNER: Well, that's part of
17  it. That's actually something I really hadn't
18  thought of, but that's a good point. What's
19  usually considered in this context is they are a
20  non-practicing entity. What they do is they
21  acquire patents, they use those patents either
22  in -- they assert them in litigation and they
23  use this information to settle cases or to
24  license not only Defendants here, but other

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

1 players in the market.  So they take our
2 information, our sales information and use that
3 in licensing negotiations with others.  And
4 that's one of the key factors that other courts
5 have found make them, while not selling products
6 in the conventional sense of being a competitor,
7 they are competitors, because their business, in
8 this context, is also in this market.
9          And cases, even ones that they
10 have cited, say that it's very clear that you
11 don't actually have to be a competitor to have
12 this information be sensitive, because of the
13 idea of settling cases and licensing others.
14          THE COURT:  And I have one other
15 question, then I'll actually let you just talk
16 to me for a while.  But is there any case that
17 has dealt with this particular situation before
18 where you have -- where outside lead counsel
19 or -- yeah, where lead counsel is in-house
20 counsel?
21          MR. ROVNER:  I have not seen that.
22 I know that having done some research that
23 Blackbird itself has done this in other cases.
24 I assume that they weren't challenged, because if

1 hours, but okay.  Thank you, Your Honor.  The
2 way that it comes down in my eyes and I think
3 that's the question that Your Honor was looking
4 for an answer to, which is the situation where
5 you're both in-house and you want to be outside
6 counsel.  And I think that the reason that it
7 doesn't work in this kind of case is that as we
8 all know, every case that has been cited, it
9 talks about a balancing test.  And generally it
10 is the -- the way it's phrased is that, is
11 there -- you weigh the right of Blackbird in the
12 case, the right to acquire discovery, the
13 ability to prosecute their case versus the harm
14 and the risk for those parties producing
15 confidential information.  You balance it.  And
16 here, what generally happens is that you weigh,
17 you know, when the Plaintiff, Blackbird, is able
18 to choose counsel that they want, they should be
19 able to choose counsel that they want, as long
20 as it doesn't harm the producing parties'
21 rights.
22          And we've seen many cases where
23 the risk of disclosure is looked at even when
24 you have outside counsel.  Here the risk is much

1 they had been challenged and the judge said it
2 was okay, we would have heard about it, but I do
3 believe that Blackbird has represented
4 themselves in other matters.  I'm not familiar
5 with anyone else doing it.  I've never been in a
6 case where this situation has occurred.  And one
7 of the things they say in their papers is that
8 we acquiesced to them appearing in the case.
9          THE COURT:  Yeah, I'm not
10 concerned about that.
11          MR. ROVNER:  All right.
12          THE COURT:  Okay.  So why don't
13 you tell me what you'd like to tell me.  I've
14 asked you the questions that I think I wanted to
15 ask you.
16          MR. ROVNER:  I have one question
17 for you, Your Honor.  How much time do I have?
18          THE COURT:  Oh, I was going to say
19 that's not the way it works.  Well, take some
20 time and when you -- I once got an invitation to
21 a cocktail party, said it starts at 4 and ends
22 when I get tired of your presence.  So think of
23 it like that.
24          MR. ROVNER:  Well, that could be

1 greater because you've got in-house counsel,
2 you've got, for example, Ms. Verlander, who is
3 sitting at the table who has been admitted pro
4 hac vice in this case, presumably going to
5 review Defendants' proprietary information and
6 she's the CEO of Blackbird.  Their business is
7 to do all the things that case law has said is
8 competitive in nature.  It's impossible for Ms.
9 Verlander, even if she wanted to, the Court's
10 have said you can't compartmentalize.  And if
11 she were to get that information, she would be
12 able to use it, whether she did it consciously
13 or subconsciously against the Defendants'
14 interests.
15          And what's very interesting here
16 is that in most cases that I've seen, you've got
17 a party who says I need this attorney because he
18 is specialized in this field and without him I'd
19 be harmed.  The California case that we sent to
20 you, the Southern District of California that we
21 sent to you this morning --
22          THE COURT:  I'm sorry, I haven't
23 been reading my mail that religiously, so I have
24 not seen the case you sent to me this morning.

13

1      MR. ROVNER:  In that case it was
2  Carousel versus Novatel Wireless.  We sent it
3  today because it was filed on May 2nd.
4      THE COURT:  I'm not being
5  critical, I'm just telling you.
6      MR. ROVNER:  There the argument
7  was and it wasn't so much -- the individual at
8  issue in that case wasn't in-house, wasn't the
9  sole attorney for the Plaintiff, but he was the
10 CEO of the company and they argued that he
11 should be able to see confidential information
12 for one of the reasons was because he had
13 specified knowledge in this field and they would
14 be prejudiced if they were not able to
15 participate in the litigation and see the
16 Defendant's confidential information.  And the
17 Court said no, while we understand that he has
18 the specialized knowledge, we're not going to
19 allow that.  And one thing that the case said
20 which was very interesting, and very similar to
21 what we have here, this is on Page 5 of the
22 decision, it said that the person at issue does
23 not have insulation for the corporate decision
24 maker, because he is, in italics, the

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

15

1      MR. ROVNER:  Well, I went through
2  and we attached to our papers the resumes of the
3  individuals, the Blackbird principles and based
4  on their backgrounds and what they tout as their
5  abilities, I have a hard time believing they
6  can't afford it.  And you know, let's assume
7  that they can't afford it, it will be difficult,
8  well, that's not the reason why you should put
9  the Defendants' confidential information at
10 risk.
11     THE COURT:  But -- and maybe
12 that's right, but there is an overall balancing
13 that's going on, right?
14     MR. ROVNER:  Yes.
15     THE COURT:  And so in terms of the
16 risks, one of the -- one of the risks, in fact,
17 I guess the primary risk that you on behalf of
18 one of your clients is interested in, is that
19 the decision makers at Blackbird will get this
20 confidential information and inadvertently then
21 decide to acquire some more patents in the
22 lighting field now knowing that your client in
23 particular makes lots of money selling the sorts
24 of lights I guess that are accused here, and so

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

14

1  corporation's decision maker as the CEO.  And
2  they were a non NPE as well.
3      The harm here, according to
4  Blackbird, and they are very candid about it in
5  their papers, is that if they -- if you rule
6  against them, guess what they're going to have
7  to do?  They're going to have to actually hire
8  outside counsel and it's going to cost them more
9  money to prosecute this case.  Well, you know,
10 when you judge that risk against the disclosure
11 of Defendants' proprietary and confidential
12 information, it's not even a close call.  We
13 weren't asked whether we wanted to hire outside
14 counsel.  That's what you do unfortunately in
15 this day and age.  But their prejudice, and they
16 say it, is gee, we're going to have to spend
17 more money in litigating against you.
18     THE COURT:  Well, I actually read
19 it as being we won't even be able to litigate
20 against you, because we can't afford it.
21     MR. ROVNER:  Well, I didn't read
22 it that way.
23     THE COURT:  Maybe I didn't read it
24 correctly.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

16

1  they'll assert their patent against you in some
2  subsequent litigation.  And that's your primary
3  harm that you see, isn't it?
4      MR. ROVNER:  Well, that's one of
5  the harms.  The other harm is or one of the
6  other harms is that they will go out and acquire
7  patents.  They will see oh, here's how the
8  products work and we'll get another patent.
9      THE COURT:  I was trying to
10 incorporate that into my primary harm, is that
11 they will essentially sue you again or at least
12 threaten to sue you again using inadvertently
13 their knowledge about your business model and
14 products that have been learned in this case,
15 right?
16     MR. ROVNER:  Yes.  That is one of
17 the problems.  The other problem is in going out
18 and licensing others, as I described before,
19 using the information that they have --
20     THE COURT:  And so the way that
21 would work is, tell me that, just run
22 hypothetically through that.  I get the idea
23 of -- so just run through for me how that works.
24 Let's assume Blackbird is going to try to

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

1  license to Acme Light Company.  I hope that's
2  not a defendant here.  The Acme Light Company
3  and they say look, we have this patent and we've
4  asserted it against Phil Rovner's client and --
5  or let's say they didn't say that, because they
6  know that -- they couldn't say that.  Let's say
7  they're thinking about it.  How could they --
8  how could they use, even inadvertently,
9  information they get about how you made your
10 products and what your financial state is to get
11 Acme to take a license to their patent?
12          MR. ROVNER:  It's not necessarily
13 to whether Acme would take a license.  It's the
14 terms of the license.
15          THE COURT:  Threaten the license
16 against --
17          MR. ROVNER:  It's the terms of the
18 license.  What they do is -- and this is
19 theoretical obviously, but that's what we're
20 talking about.
21          THE COURT:  You say theoretical,
22 the terms of the license.  This presumes that
23 they know what terms of a license your company
24 enters into or you've now educated them by

1  is because 10 times out of 10 that person in the
2  company who is allowed to look at this is not a
3  competitive decision maker.  He is running the
4  litigation.  I'm sure you've heard many
5  arguments from people saying, Your Honor, we
6  need to communicate with our client.  And the
7  way they sell it to you is to say it will help
8  settlement.  So that's how they get somebody
9  from the company.  And I've made the same
10 arguments.  You'd like to have a client contact
11 who can see sensitive information.  It does help
12 settlement.  But there that individual isn't out
13 there then deciding to, you know, acquire
14 patents to sue you.  He's segregated from that
15 because he is not a competitive decision maker.
16 And there's no question -- so the issue here and
17 in all the case law is what is a competitive
18 decision maker?
19          And you know, we've got two people
20 who are -- three people who are admitted in the
21 case so far from Blackbird.  One is Ms.
22 Verlander.  She's the CEO.  The other is Mr.
23 Freeman, who is the co-founder of the company.
24 They're all members of the patent bar and I

18

1  saying, well, you have to license the filament
2  separately from the glass, something --
3          MR. ROVNER:  It could be both
4  technical and it could be both financial.  For
5  example, they get our information about profit
6  margins, sales revenues, all types of costs of
7  manufacturing, they get that information and
8  then they use it to their advantage to license
9  others in the industry that are competitors to
10 the Defendants here.  So it could be -- getting
11 that information -- and we're talking about
12 competitive decision makers of the company.
13          Now, I'm sure Your Honor is
14 familiar with cases where, for example, someone
15 in house, they have a large company, you know,
16 and one individual, let's say from the company's
17 perspective, is allowed to see Defendant's
18 highly confidential information.  I'm sure
19 you've signed protective orders and I don't cite
20 you your own protective orders, because --
21          THE COURT:  No, but I understand
22 that's in a lot of things like drug litigation.
23          MR. ROVNER:  And the reason that
24 you do that and the reason parties agree to that

20

1  assume that if you said they could litigate this
2  case and get access to all of the Defendants'
3  material, we'd have seven more pro hac vice
4  applications and everyone from the company would
5  see it because there would be no bar to it.
6          THE COURT:  So part of what I'm
7  thinking about is this -- you know, we're
8  talking about inadvertent disclosure of your
9  confidential information.  And it's certainly
10 true that a person who has confidential
11 information who is doing something related to
12 the confidential information would have some
13 serious problems putting something they know out
14 of their mind.  It's hard to do two things at
15 once where you have to ignore something you
16 know.  But it also seems to me that the primary,
17 the first harm that you're concerned about is
18 for your client.
19          And in this sense let's assume for
20 the sake of argument that there's lots more
21 companies in the electrical supplies field,
22 their negotiations with third parties have, at
23 most, a pretty indirect effect on your client,
24 right?

21

1       MR. ROVNER: Well, the case law
2 has said that an NPE situation where someone is
3 trying to license in the field is a direct
4 competitor and it's as equal to somebody who is
5 actually selling the product. And I could cite
6 you cases that were actually in their papers
7 that say just that, that it's the same level of
8 competition.
9       THE COURT: Okay. So I've got
10 their papers here. What case are you --
11       MR. ROVNER: If you look at their
12 brief, it's -- the case I'm referring to is in
13 Footnote 3 of their letter brief and on Page 3.
14 And it's the case at the bottom, ST Sales Tech
15 Holdings versus Daimler Chrysler. And I can
16 read you a passage from that case.
17       THE COURT: Well, actually, you
18 know, strangely enough, the phrase that
19 immediately precedes the cited case is making
20 repeated suits against the same producer likely,
21 which would seem to be what I was saying was the
22 primary concern.
23       MR. ROVNER: In that case, that
24 was the outcome of the case hinged on that,

22

1 but -- well, it's our concern and we don't want
2 to get to the situation where they are repeat
3 filers against the Defendants. And the ST Sales
4 case said, gave the reasons why that would be a
5 problem. And also basically said what becomes,
6 you know, what the harm is. And that case is
7 instructive because it talks about that you can
8 be a competitor even if you don't sell a
9 competing product.
10       THE COURT: Well, and so -- so,
11 you know, I haven't read that case, but I guess
12 what I'm wondering is one of the things that I
13 was thinking about was whether a large part of
14 your concern, all the Defendants' concerns
15 wouldn't be taken care of by some kind of bar
16 from the Plaintiff suing you again over some
17 period of time.
18       MR. ROVNER: Well, that would
19 alleviate one concern. I'm just sort of
20 thinking off the top of my head. That would
21 alleviate a concern, but not the other concerns
22 which is the case has recognized, which is going
23 out and competing in the marketplace by
24 licensing others and using that information.

23

1 That would be helpful.
2       THE COURT: But part of the thing
3 is the -- what I was thinking is, the competing
4 by licensing others, I mean, I think I
5 understand what you're saying, but it seems to
6 me that that was -- because we do start off with
7 the premise -- I mean, that's truly the -- all
8 right.
9       Let's hold that thought.
10 Actually, I'll ask Mr. Thompson in a moment to
11 address that. But leaving aside the question of
12 negotiating licenses and these patents to
13 others, which may not be an insubstantial thing
14 to leave aside, and perhaps to have some bar
15 against suit against Defendants' extending, you
16 know, some period of time beyond when this suit
17 is wrapped up -- well, anyway, that's what I'm
18 thinking about. What else would you like to say
19 Mr. Rovner?
20       MR. ROVNER: Well, one thing. We
21 are -- I think in some respects we're sort of
22 going down the road too far, because the initial
23 inquiry that all the courts address is this
24 balancing test, harm to one party versus harm to

24

1 the other. In this case their harm is they, you
2 know, there's no specialized knowledge of their
3 attorneys, that they would be better off by
4 seeing the Defendants' technical information,
5 they are not experts in LED lighting. Their
6 harm is it would cost them more money versus, as
7 I said, the possibility of disclosure of our
8 proprietary and technical information.
9       THE COURT: But isn't that usually
10 the harm to the Plaintiff, if that's who the
11 party is? Because I've had cases where, you
12 know, the Plaintiff, the outside counsel, said,
13 you know, we have 22 attorneys and 20 of them
14 are working on this case and if you bar us from
15 patent prosecution activities, then we can't do
16 any patent prosecution activities and we're the
17 ones who know the technology and in the end
18 that's just a dollar and cents harm too, maybe a
19 bigger dollar?
20       MR. ROVNER: You often wonder
21 dollar and cents problem to who, the counsel or
22 the client? But be that as it may, that does
23 not trump the fact that you frequently have
24 prosecution bars which precludes somebody from

25

1  viewing technical information and then
2  prosecuting a patent.  And we've got the flip
3  side of this argument, which is also the scope
4  of the prosecution bar.  They are also, as I
5  mentioned, members of the patent bar.  And the
6  Defendants are concerned that not only will they
7  take this information and go acquire patents to
8  use it, that's the acquisition bar we propose,
9  but they're going to take our technical
10  information and say oh, we'll amend our claims.
11  That's a typical prosecution bar issue that Your
12  Honor is very familiar with.  So that is still,
13  you know, a huge concern.
14        And you could say well, why don't
15  you just resolve it with an appropriate
16  prosecution bar?  Well, the problem is while we
17  agree that one is necessary, we don't agree on
18  the scope of the prosecution bar.  What
19  Blackbird proposes is they want their in-house
20  counsel, who are acting as outside counsel, to
21  see everything Defendants' produce, every shred,
22  yet they say that they will be barred from
23  prosecuting patents against the Defendants only
24  for products that are not yet marketed.  So what

27

1  even more so, the prosecution bar is even more
2  sensitive here, as I said, when they want to see
3  everything.
4        The other point that Your Honor
5  made and then I'll answer any other questions
6  that you have, is that you said that you read
7  their papers as saying that they couldn't afford
8  to hire outside counsel.  We were told in the
9  negotiations for this protective order that if
10  you don't go --
11        THE COURT:  Are you sure you want
12  to tell me this, whatever it is you're about to
13  tell me?
14        MR. ROVNER:  Yeah, it's not --
15        THE COURT:  It's not settlement
16  negotiations?
17        MR. ROVNER:  No.
18        THE COURT:  All right.
19        MR. ROVNER:  We were talking about
20  trying to resolve this matter.  Has nothing to
21  do with settlement.  Is that they will have to
22  hire outside counsel.  That's the downside for
23  them.  And so, when you take that risk and weigh
24  it against the risk to the Defendants, the case

26

1  they're saying is that they won't, you know,
2  look -- they'll be barred from seeing -- they
3  won't look at any information regarding products
4  that are not, are not being marketed.  Then they
5  say in their letter, in that, but don't worry
6  because nothing like that will ever be produced
7  in this case.  So basically what they are
8  attempting to preclude themselves from seeing is
9  something that they believe will never see the
10  light of day in this case.
11        What we want and we think is
12  absolutely appropriate, even more so in this
13  context, is that the in-house counsel here, if
14  you don't say they cannot have access to highly
15  confidential information and you say they can
16  except for the prosecution -- if they see it,
17  they'll be barred from the prosecution of
18  patents or the acquisition of patents, then it
19  has to involve both current and future products.
20  It can't just relate to being barred from
21  prosecuting patents when they see information
22  regarding future products.  It doesn't give us
23  any protection.
24        The other thing that, and it's

28

1  law that's cited sort of doesn't make it a close
2  call, that the risk to the Defendants is far
3  greater than added expense to the Plaintiff.  As
4  I said earlier, Plaintiff didn't ask us, gee, is
5  this case going to be expensive for you when we
6  sue?  So I don't think that needs to be a factor
7  that needs to be considered, cost to Blackbird.
8        THE COURT:  All right.  Thank you,
9  Mr. Rovner.
10        THE COURT:  Mr. Thompson.
11        MR. THOMPSON:  Thank you, Your
12  Honor.
13        THE COURT:  So Blackbird has a
14  physical office somewhere in Massachusetts,
15  right?
16        MR. THOMPSON:  That's right.  It's
17  in Concord, Mass.  And --
18        THE COURT:  And all the lawyers
19  who work for Blackbird work in that physical
20  office?
21        MR. THOMPSON:  That's correct,
22  Your Honor.  Oh, no.  There's Ms. Verlander and
23  myself in that office, another lawyer who will
24  be joining us in that office in a month.  There

29

1  is a lawyer in Virginia at this point and two
2  lawyers in Chicago.
3        THE COURT:  And they work
4  electronically?
5        MR. THOMPSON:  Correct.
6        THE COURT:  Okay.  All right.  And
7  the lawyers who are involved in this particular
8  case are Ms. Verlander, you and who is the third
9  one?
10       MR. THOMPSON:  Mr. Freeman.
11       THE COURT:  So I know Ms.
12  Verlander is the CEO.  What is Mr. Freeman?
13  What is his role in the company?
14       MR. THOMPSON:  Mr. Freeman handles
15  primarily litigation.  He's also at a high level
16  involved, at the highest level, I suppose,
17  involved in acquisition at the final step, yes
18  or no we should acquire this patent and in the
19  general management of the company.
20       THE COURT:  All right.  And what
21  is it that you do?
22       MR. THOMPSON:  I handle
23  litigation.
24       THE COURT:  Okay.

31

1        THE COURT:  So that would make it
2  fairly analogous.
3        MR. THOMPSON:  And second, they
4  involved companies that were direct competitors,
5  true marketplace competitors, which we think is
6  not the case here.  So these cases present
7  actually higher risk of inadvertent disclosure
8  than what we would suggest is present here.
9        THE COURT:  I guess actually the
10  difference between in-house litigation teams is
11  I'll bet none of those in-house litigators were
12  also the CEO, right?
13       MR. THOMPSON:  That's fair, Your
14  Honor.  That's true.  But the CEO's of those
15  companies had business responsibilities that
16  were far different from what the CEO of our
17  company effectively does day to day.
18       THE COURT:  Well, I assume that's
19  because they were in a different line of work.
20       MR. THOMPSON:  Well, exactly, but
21  those CEO's have the ability and people in
22  business units generally have the opportunity,
23  and much more opportunity than us, to
24  inadvertently misuse that information because

30

1        MR. THOMPSON:  I am not involved
2  in prosecution or acquisition.
3        THE COURT:  And you are not
4  admitted to the PTO?
5        MR. THOMPSON:  That's correct,
6  Your Honor.
7        THE COURT:  Okay.  Now, the
8  question I asked Mr. Rovner, is has this issue
9  ever been decided by a judge before that you
10  know of?
11       MR. THOMPSON:  Yes, Your Honor.
12  We think there are analogous cases that are on
13  the point.  And if we -- if you permit me, we
14  have some slides prepared that I can hand up to
15  you.
16       THE COURT:  Okay.  Sure.
17       MR. THOMPSON:  We think two cases
18  are on point.  One of which was actually cited
19  by Defendants in their letter and one of which
20  was cited in our letter.  And I think what's
21  important about both these cases is two things
22  in particular; first, they involved in-house
23  counsel who were serving as primary trial
24  counsel.

32

1  they were actually in competition with the
2  companies whose information they were seeing.
3        In this first case, Affymetrix v.
4  Illumina, it's a Delaware case.  Defendants cite
5  this for the proposition or for the fact that
6  Illumina's in-house lawyer was denied access.
7  And that was a classic in-house counsel who was
8  just there to supervise outside counsel.  But
9  the more relevant holding is the fact that
10  Affymetrix in-house litigation unit who were
11  serving as primary counsel here, were granted
12  access.  And again, these were direct
13  competitors who actually made and sold products
14  that competed with one another.  And we would
15  suggest we are far more like the Affymetrix
16  in-house litigation unit than we are a classic
17  in-house counsel, who's only real need for that
18  information is to supervise outside counsel.
19       THE COURT:  Okay.
20       MR. THOMPSON:  And the second case
21  which is cited in our papers, a recent case from
22  the District of Massachusetts, involved two
23  direct competitors actually in the LED lighting
24  business; Philips, who is the largest player and

33

1  Amerlux.  And Philips, like Affymetrix, has
2  developed an in-house litigation unit of
3  specialists who handle their litigations
4  repeatedly.  And I would note particularly they
5  handle patent assertions.  And the Court
6  specifically found, although they were
7  responsible for identifying licensees,
8  negotiating license agreements, overseeing
9  procurement and reverse engineering of
10 potentially infringing activity and pursuing
11 repeated enforcement actions, they still
12 received access to their direct competitor's
13 sensitive information.
14         And we would suggest both these
15 cases are directly on point.  And suggest,
16 particularly given the lower risks inherent in
17 the relationship between our company and
18 Defendants, that the bar defense have requested
19 is vastly overbroad and should be rejected.
20         THE COURT:  Well, so, what about
21 what I was suggesting to Mr. Rovner, that one of
22 the ways to cure or minimize the issue would be
23 to have some bar from you suing these Defendants
24 for some period of time into the future?

35

1  final word on?
2         MR. THOMPSON:  She's the final --
3  the two things you mentioned were prosecution
4  and acquisition?
5         THE COURT:  Acquisition and
6  litigation.
7         MR. THOMPSON:  Yeah.  No.  It's
8  true she is the final word on that, but the
9  question is, is she possibly going to acquire
10 information in this lawsuit that could somehow
11 be inadvertently used in acquisition or in
12 bringing other suits?
13         THE COURT:  Well, so if there's no
14 acquisition of LED lighting related patents that
15 are going to be related to LED lighting and
16 there's no further -- you would agree that if
17 the question came up whether or not to acquire
18 more patents in the LED space, that would be
19 pretty competitive decision making, wouldn't it?
20         MR. THOMPSON:  I don't necessarily
21 think it would.  I think you have to understand,
22 and it's important to understand how acquisition
23 actually works at Blackbird.  And generally on
24 these issues, I think the law is very clear that

34

1         MR. THOMPSON:  I think that could
2  be workable depending on the specifics of it, if
3  it were necessary, but I think, you know,
4  initially, under the law there would have to be
5  a finding that the lawyers to be barred are
6  competitive decision makers, which we don't
7  think is the case.  And we don't think
8  Defendants have met their burden of showing
9  counsel by counsel.
10         THE COURT:  Let's talk about Ms.
11 Verlander.  You're saying she's not a
12 competitive decision maker?
13         MR. THOMPSON:  With respect to
14 Defendants, no.  I don't deny that she is a
15 decision maker for the company, but she's not a
16 competitive decision maker with respect to
17 Defendants.
18         THE COURT:  But she presumably, as
19 CEO, has the last word on everything, right?
20         MR. THOMPSON:  That's right.
21         THE COURT:  And this includes
22 patent acquisitions, deciding who to sue,
23 deciding -- well, everything, right, but the two
24 things that I mentioned, presumably she's the

36

1  Defendants have to establish at a very granule
2  level that there's risk, rather than just making
3  blanket statements that there are.
4         THE COURT:  But I mean, isn't
5  it -- I mean, isn't it more or less obvious that
6  getting patents that relate to the subject
7  matter of this litigation presents risk?
8         MR. THOMPSON:  Well, let me
9  explain how we actually get patents and I think
10 it will be become clear that the risk is
11 infinitessimally, highly attenuated.
12         THE COURT:  Okay.
13         MR. THOMPSON:  So we have a group
14 of patent analysts, who are not lawyers.  They
15 are part-time employees.  They're college
16 students, in fact, who do the first line
17 analysis, looking at patents to select them for
18 acquisition.  These are not people we're
19 proposing at all who would have access to this
20 information, do not work in that office -- any
21 office, effectively a separate unit of the
22 company.  Those people make an initial
23 assessment, it goes up to another lawyer, who
24 again would not have access to these documents.

**37**

1  And then only after it goes through those two
2  levels is it ever coming to Ms. Verlander or Mr.
3  Freeman.
4       So as a practical matter, I don't
5  disagree that there's risks, but I think it's
6  highly attenuated that somehow they would have
7  knowledge from this suit that might be relevant
8  to a patent that trickled up to them through
9  that process.  And I'd also point out, unlike a
10 lot of the NPE --
11      THE COURT:  So that means that,
12 because it seems to me like that's the flip
13 side.  You're saying very unlikely such a patent
14 would even trickle up?
15      MR. THOMPSON:  Right.
16      THE COURT:  In which case there's
17 not much in our view with saying well, just in
18 case of that rare event, let's make sure it
19 doesn't actually happen, right?
20      MR. THOMPSON:  I think you're
21 suggesting make sure it doesn't happen via an
22 acquisition bar?
23      THE COURT:  Could be one way.
24      MR. THOMPSON:  That's tremendously

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**39**

1  litigators or people who do litigation at the
2  company, so even removing two of our six is a
3  pretty significant hit to us.
4       THE COURT:  So what about one
5  other thing that I believe the Defendants
6  suggested in their letter, which is I don't
7  expect Mr. Stamoulis to be technically involved
8  in the case and so I don't think saying well, he
9  can see technical information is at all a
10 reasonable approach.  On the other hand, I'm not
11 so sure that the only he can see financial
12 information is unreasonable, because I imagine
13 that it doesn't take a lot of effort on his part
14 to digest financial information.  You know, like
15 I said, I can't imagine him looking at
16 specifications.
17      MR. THOMPSON:  Right.
18      THE COURT:  But I can imagine him
19 doing something else that doesn't -- and then
20 that's part of the reason why I was asking Mr.
21 Rovner about the two different categories,
22 because it seemed to me there was some
23 possibility that you could think about them
24 separately in terms of what's, what's possible.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**38**

1  broad, since we'd be barred on, I believe the
2  language they proposed is the subject matter of
3  the asserted patent.
4       THE COURT:  Well, that's kind of a
5  technical issue of how to say what it is and to
6  some extent if you combine that with some
7  prohibition against suing them in the future,
8  you know, it could probably be pretty narrow.
9       MR. THOMPSON:  But we'd still have
10 a bar on some subject matter that would be
11 overbroad as to Defendants' concerns, since this
12 bar would bar us from getting patents period in
13 that area, regardless of whether we ever
14 asserted any of them against them.
15      THE COURT:  Well, it does seem to
16 me that probably -- I'd have to think about it a
17 little more maybe, but it does seem to me those
18 are perhaps two different ways to get to the
19 same place.
20      MR. THOMPSON:  I take your point,
21 but I think at the highest level you have to
22 balance the harm from -- even assuming it's just
23 Ms. Verlander and Mr. Freeman who are excluded
24 from these documents, we only have six

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**40**

1  And I guess it all gets back to or gets down to
2  right now, and as far as I know, you have kind
3  of a -- we have a situation here where normally
4  we have two groups, normally we have the outside
5  counsel, normally we have the in-house decision
6  makers for the in-house counsel.  And here the
7  two are an overlay or practically an overlay.
8       MR. THOMPSON:  Right.
9       THE COURT:  And, you know, I was
10 thinking about this, is Mr. Rovner's position I
11 think might be characterized as you have to --
12 he wants me to tell you to conform to the model
13 that the law has developed to address.  And you,
14 it could be said, want me to basically treat you
15 as outside counsel when it's convenient to do so
16 and treat you as in-house counsel when it's
17 convenient to do so.  And you want the law to
18 adapt to your arrangement.
19      MR. THOMPSON:  On your last point
20 as to the in-house, I think the reality, the
21 practical reality is what we are doing is no
22 different than what outside counsel would do,
23 litigating patent cases.  Often -- and I think
24 it might be fair to say, most patent litigators

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

41

1  are litigating on behalf of a group of clients,
2  however big or small that is, over multiple
3  cases, in the same industry over some period of
4  time.  Those people are almost never subject to
5  bars, even though there is effectively the same
6  potential for them to misuse information.  The
7  reality is a true outside counsel who learns
8  something in one case could make use of that in
9  another case.  That's very common.
10        THE COURT:  But that's where the
11 risk gets lower in a situation where -- because
12 of the separation between outside counsel and
13 their client, whereas here you are your own
14 client.
15        MR. THOMPSON:  Right, but the
16 risks of that information going into the client
17 tend to be more business risks, because it would
18 be bad if the business side of those clients
19 could get that pricing information or product
20 information and make design decisions, pricing
21 decisions.
22        THE COURT:  And what we have here,
23 the business side of the client does get the
24 information.

43

1  displays.  Not related at all.  So it doesn't
2  make sense, I don't think, to treat an entity
3  that is litigating in all these different areas,
4  much like conventional outside counsel are, as a
5  competitor of these Defendants.  And I guess
6  just two different animals.
7        THE COURT:  What about licensing
8  activities?  I think that was a question when
9  Mr. Rovner brought it up, I said I was going to
10 ask you about.  I take it that, I'm guessing,
11 maybe the answer is in here and I have
12 overlooked it.  Could happen.  But Blackbird is
13 also trying to license these various patents
14 independent of bringing lawsuits, right?
15        MR. THOMPSON:  Correct.
16        THE COURT:  And who does that?
17        MR. THOMPSON:  That is, I guess at
18 this point primarily handled by Ms. Verlander
19 and the rest of the litigation team.  I mean, I
20 struggle somewhat because it's a new company so
21 it's hard to make definitive pronouncements
22 about what people are doing.
23        THE COURT:  When you say it's a
24 new company, it was founded in 2014?

42

1        MR. THOMPSON:  I would phrase it
2  as more there is no business side relative to
3  Defendants.  It is --
4        THE COURT:  So wait a second, Mr.
5  Thompson.  There is a business side, right?
6        MR. THOMPSON:  There's a business
7  side, but it doesn't compete with Defendants.
8  There's a lot of NPE's, for example, that have
9  large portfolios that are dedicated to a single
10 area of technology.  Ground Rock Research has
11 its portfolio of 3,000 micron patents.  I think
12 it makes sense to treat those NPE's as
13 competitors in the market because they're in
14 that market.  People don't take a license.  They
15 sue them in that market.  That's what they do.
16 We're not like those NPE's.  We have a
17 diversified patent portfolio.  We don't focus on
18 any particular area of technology.  We don't
19 target any area of technology in our acquisiton.
20 If you look at the five cases that we brought
21 thus far, all which have been in Delaware, they
22 ranged -- just pull the slide up to those.  They
23 range across radically different areas of
24 technology, pet carriers, tow brakes, laptop

44

1        MR. THOMPSON:  Founded in 2014.
2  It has only recently acquired the employees it
3  acquired.  The longest tenured employee beyond
4  the two founders has been there for three, maybe
5  four months.  Let me more precisely try to
6  answer who is handling licensing.  I mean, at a
7  very practical level.  Once we determine we have
8  a basis to assert the patent, I think it would
9  be fair to actually to say then the litigator
10 who would then litigate that case makes an
11 attempt to license it.
12        THE COURT:  So in this case is
13 that you?
14        MR. THOMPSON:  It wasn't me in
15 this particular case, but going forward it could
16 be me in those cases.  But I don't know what
17 information I would get from one lawsuit that
18 would potentially be used to our advantage in
19 licensing with respect to the other entities.  I
20 just don't understand what it would be.
21        THE COURT:  I think I actually do
22 understand that.  And of course I say this with
23 the premise of this is that I believe that you
24 would not intentionally use their information

45

1  for Blackbird's advantage, but let's say you
2  learn about the profit margins of their
3  products, seems like the kind of thing you might
4  learn in this litigation that's highly
5  confidential and then you go, maybe not to
6  Amerlux or Koninklijke Philips, I take it
7  there's a lot of other competitors out there in
8  this industry?
9          MR. THOMPSON:  In the LED
10  industry?
11          THE COURT:  Well, whatever
12  industry these Defendants are in.
13          MR. THOMPSON:  Yes.
14          THE COURT:  Kind of hard for me to
15  imagine that, when you're formulating what kind
16  of license -- what kind of royalty you'd like
17  them to pay you or even if it's a lump sum, how
18  you'd put out knowing that these people make
19  obscene profits.  How do you put that out of
20  your mind?
21          MR. THOMPSON:  That's exactly the
22  type of thing outside counsel are required to
23  put out of their mind who participate in
24  licensing, are required to put out of their mind

47

1  case that if, if for some reason or other
2  Blackbird's attorneys couldn't represent --
3  couldn't be outside counsel, you'd go out and
4  hire other outside counsel?
5          MR. THOMPSON:  We -- two things on
6  that point.  One, we'd have to make a decision
7  based on the precise scope of your order.  If
8  it's a complete bar, you know, we'd be facing a
9  different situation than partial.  It's hard to
10  speculate.  I'm not trying to evade the
11  question.
12          THE COURT:  No, I think that's
13  fair.  But I guess what I'm really asking is if
14  you thought you had to hire outside counsel,
15  that's what you'd do?
16          MR. THOMPSON:  I mean at some
17  point if we could not litigate the case, is I
18  suppose we'd have to, but I would also stress
19  that would present an extremely serious harm to
20  our company.  That is --
21          THE COURT:  Financial harm?
22          MR. THOMPSON:  Well, the structure
23  of the company is such that we have, like a lot
24  of companies, like companies in these cases,

46

1  all the time.
2          THE COURT:  But that's not usually
3  the way it's presented to me, that outside --
4  usually that's what the separation is, is
5  licensing is generally done by the client and
6  the in-house lawyers and whoever does licensing
7  don't usually license things for outside
8  counsel.  At least I haven't heard that.
9          MR. THOMPSON:  I don't think it's
10  uncommon for outside counsel to be involved in a
11  licensing campaign, particularly in the
12  immediate advanced period ahead of the
13  litigation.  I think it's common at that point.
14          THE COURT:  And of course -- okay.
15  Ahead of litigation.
16          MR. THOMPSON:  I think at that
17  point your outside counsel has likely done an
18  analysis to determine if there's a basis to sue
19  and is involved deeply in any license campaign
20  you might be undertaking.  And I think it's
21  important to remember that's primarily the
22  context in which we would be doing this.
23          THE COURT:  All right.  So one of
24  the things that Mr. Rovner mentioned, is it the

48

1  brought in house, for cost savings reasons, the
2  litigation function.  And it allows us to
3  provide an opportunity for smaller companies,
4  independent inventors, to try to realize some
5  value from there IP through litigation that they
6  might not otherwise be able to afford.  That's
7  really the business we are in.
8          THE COURT:  Right.  I think I -- I
9  understand that's the business model you want to
10  have.  I mean, I do understand that.
11          MR. THOMPSON:  And I think the
12  Federal Circuit has instructed that you have to
13  balance the harms as we've talked about today,
14  and if the harm is so severe that it would
15  effectively destroy the company, I think that
16  has to weigh strongly in the balance, as to
17  whether access is granted.
18          THE COURT:  This is perhaps not a
19  question -- I'm going to ask this question, but
20  if you don't think it's an appropriate question
21  to answer, just say so.  What would prevent
22  Blackbird from changing its name to Verlander,
23  Freeman & Thompson and just being a law firm
24  that litigates effectively?

49

1    MR. THOMPSON:  I don't think there
2  would be much to prevent it.  I think a lot of
3  NPE's are structured in that way or NPE's that
4  do campaigns of litigation are structured in
5  that way.  And I think that's exactly the point.
6  In that situation, we'd never been here, because
7  you'd be outside counsel and you would not be
8  subject to this bar.  The difference here is
9  that we have this in-house counsel label, but
10  the Federal Circuit's made clear that you have
11  to look beyond the label as to what is actually
12  happening at a lawyer by lawyer level.  And I
13  think if you do that, if you do, as Defendants
14  have not done, lawyer by lawyer, what the people
15  they're seeking to bar are doing is no different
16  than what they'd be doing, exactly the structure
17  you describe.  And that's ultimately why we
18  should get access to these documents.
19    THE COURT:  All right.  And just
20  to make sure that I got this correctly, you do,
21  yourself, expect to be attempting to license the
22  asserted patents at some point down the road?
23    MR. THOMPSON:  The patents
24  asserted in this case?

51

1  proposed category for documents that are within
2  the subject of the prosecution bar category or
3  definition of that category are documents
4  relating to future products.  Defendants have a
5  broader, we would suggest vaguer definition
6  where those documents could include I think
7  anything that could cause harm, competitive harm
8  in prosecution or acquisition.  And I think it
9  was suggested by my colleague that they
10  presented this trigger to us as if, or this
11  definition of the prosecution bar documents to
12  us and that we rejected it.  But if we agreed to
13  that scope of what documents would trigger the
14  prosecution bar, that they would have given us
15  access to highly confidential documents.  That
16  didn't occur.  It was very clear that even if we
17  accepted their proposal on the prosecution bar,
18  their position was still that we should not have
19  access to highly confidential documents.  And I
20  would further suggest that if it was simply a
21  matter of agreeing to their definition for
22  documents that would trigger the prosecution
23  bar, I don't think we'd be here today.
24    THE COURT:  Okay.  Anything else,

50

1    THE COURT:  Yes.
2    MR. THOMPSON:  That's a definite
3  possibility.
4    THE COURT:  All right.  Is there
5  anything else you'd like to tell me?
6    MR. THOMPSON:  Briefly just two
7  points, on the prosecution bar and on the
8  potential harm to Defendants.  I think, and it
9  is well settled in this district in particular,
10  that the real competitive risk from having this
11  information is prosecution, because you have the
12  potential to change the claim scope.  That
13  potential doesn't exist in the acquisition
14  context, which makes that far less competitively
15  concerning.  And yes, there's a dispute as to
16  the trigger for that bar, but I'd like to point
17  out that it was never presented to us as if we
18  would agree to their proposed trigger and we
19  would get access to those documents.  That was
20  not the offer on the table from Defendants.
21    THE COURT:  So just give me a
22  little on the second point there, just give me a
23  little more detail.
24    MR. THOMPSON:  Of course.  So our

52

1  Mr. Thompson?
2    MR. THOMPSON:  One final point on
3  harm to Defendants.  I mean, I realize that you
4  read our first document request, which is broad,
5  but not broader than is common in these cases.
6  But the fact of the matter is this is a
7  structural patent asserted to LED lighting
8  apparatuses where the structure, the allegedly
9  infringing structure is visible.  This is an
10  excerpt from one of your infringement claim
11  charts that is publically filed at Defendants'
12  insistence.
13    THE COURT:  So does that mean you
14  don't want schematics?
15    MR. THOMPSON:  It's tough for me
16  to make a representation of whether we can live
17  without schematics, but to the extent those
18  schematics were submitted to Underwriters
19  Laboratory for safety approvals, which we
20  understand to be what happens in this industry,
21  I think it's very possible we would be able to
22  live with just those documents and samples.
23    THE COURT:  Think any of those
24  things that are submitted to Underwriting

53

1 Laboratories are publically available?
2      MR. THOMPSON:  I don't know if
3 they are publically available, but it makes them
4 much less sensitive.  And generally the
5 documents we're talking about here are much less
6 sensitive than true black box technologies that
7 can't be seen visibly if you just take the cover
8 off the label.
9      THE COURT:  I take it -- all
10 right.  Anything else, Mr. Thompson?
11      MR. THOMPSON:  And my final point
12 on this same issue, after we submitted letter
13 briefs, the Defendants produced their core
14 technical documents to us.  I think their
15 behavior here is really telling, with respect to
16 that production is really telling as to how
17 serious the harm is here.  As my colleague
18 mentioned, we agreed they can produce their core
19 technical documents to our local counsel, we
20 wouldn't look at them pending resolution of this
21 dispute.  Two Defendants, ELB and Feit produced
22 their confidential documents to us anyway.  A
23 third Defendant, Home Ever produced a very small
24 production which was not designated

55

1      MR. THOMPSON:  Feit, F-E-I-T.  We
2 did not look at them.  We simply sent them on to
3 our local counsel, because we had agreed that we
4 weren't going to look at them, so we didn't.
5      THE COURT:  All right.  Thank you,
6 Mr. Thompson.
7      MR. THOMPSON:  Thank you, Your
8 Honor.
9      MR. ROVNER:  Your Honor, a few
10 comments.  One of those Defendants that were
11 identified are not clients that I represent.
12 And we were very careful, the Defendants who we
13 represent, to provide Mr. Stamoulis with
14 documents that were clearly designated as which
15 ones were confidential, which ones were not.
16      THE COURT:  And so I don't want to
17 put anyone on the spot here, but does anybody
18 here that represents Home Ever, ELB or Feit know
19 anything about this?
20      MR. FLYNN:  I represent ELB and
21 Feit, Your Honor.  My understanding is that
22 there are core technical documents that we
23 understand go to the infringement contentions,
24 but that's a different category from the

54

1 confidential.  And when we inquired as to
2 whether -- which surprised us.  And when we
3 inquired as to whether that production was
4 complete, their counsel responded in writing
5 saying that it was and that we didn't need other
6 documents because there's nothing secret or
7 proprietary going on here.  And we were able to
8 thoroughly examine the products by just taking
9 the samples to make our infringement
10 contentions, but yet all three of these
11 Defendants have joined this motion saying it
12 would be unconscionable to allow us to see their
13 technical documents.  I would respectfully
14 suggest you can't square those statements and it
15 strongly indicates that the balance of harms is
16 vastly in Blackbird's favor.  And for that
17 reason we'd ask that you enter our proposed
18 protective order.
19      THE COURT:  The three Defendants,
20 Home Ever is one there.
21      MR. THOMPSON:  ELB and Feit.
22      THE COURT:  And they are the ones
23 who produced their core technical documents to
24 you and who is the other one?

56

1 schematics, the technical, the inventor
2 drawings, et cetera that they're asking for in
3 their document requests.  So we've given them
4 the documents we think they need to meet their
5 burden on infringement contentions, but we
6 haven't given them the kinds of documents that
7 they're asking for in their document requests
8 that go to a far greater level of detail.
9      THE COURT:  Okay.  And Ms. Farnan,
10 you represent Home Ever?  Is that the people you
11 are withdrawing from?
12      MS. FARNAN:  Not -- no, Your
13 Honor.  Okay.
14      THE COURT:  Do you know anything
15 about this?
16      MS. FARNAN:  My co-counsel did, in
17 fact, send that e-mail but it was directed to
18 the fact that they had publically available
19 information in which they based their
20 infringement contentions.  They haven't gotten
21 anything from our client that is highly
22 confidential.  And I would also suggest, Mr.
23 Thompson knows that all of my clients are having
24 difficulties in this litigation financially

57

1  participating and my co-counsel was making an
2  attempt to meet our obligations while our
3  clients are really financially unable to.  So I
4  don't think it's appropriate for what our
5  clients did in that regard which was not to
6  provide highly sensitive information for that to
7  be used against the other Defendants, because
8  Mr. Thompson knows those are very different
9  circumstances.
10           THE COURT:  Okay.  All right.
11  Okay.  Mr. Rovner, sorry.  I just wanted to --
12           MR. ROVNER:  We've heard one side
13  of the story.  Just to be --
14           THE COURT:  I haven't heard two
15  sides of the story now?
16           MR. ROVNER:  No, you heard from
17  the other Defendants.  We represent a Defendant,
18  ETI, that produced, I think, 2,000 pages of core
19  technical documents to Mr. Stamoulis.  This was
20  about two weeks ago.  We realized that some of
21  them, many of them were designated highly
22  confidential and should not have been and we
23  redid our whole production and sent it to Mr.
24  Stamoulis with many of the documents

59

1  Blackbird representing themselves, it was
2  Verlander and Freeman, they were a separate
3  firm?  And I think my colleague said something
4  along the lines of, well, it would be a big
5  difference or you know.  It wouldn't be any
6  difference at all, because the inquiry is not
7  the name on the door.  The inquiry is -- and I'm
8  just looking at the U.S. Steel versus U.S. case,
9  which is the Fed Circuit 1984 decision.  It's
10  not about your name on the door, as I said, it
11  is who is the competitive -- who is making the
12  competitive decision making.  In the context of
13  Blackbird, it's very clear who is making the
14  competitive decisions.  We heard that when you
15  asked who is responsible for licensing, got an
16  honest answer, Ms. Verlander and the rest of the
17  litigation team.  You further questioned counsel
18  and he said yes, going forward I'm going to be
19  involved in licensing.  So when you talked about
20  well, outside counsel is often involved, he said
21  outside counsel is often involved in licensing.
22  That could be.  I don't think it's often, but it
23  certainly happens.  But guess what?  Outside
24  counsel is not what the courts have described as

58

1  de-designated so we did not abuse the agreement
2  that we had.  So we were very careful not to
3  just, you know, dump everything and mark
4  everything as highly confidential and not give
5  access to the manuals.  So, to Blackbird.
6           A couple things that I heard that
7  I frankly was stunned to hear.  First of all, I
8  heard that if you don't grant -- if you don't go
9  their way, it could destroy the company.  I
10  searched through their papers, didn't see
11  anything about destroying the company.  And I
12  have say that I don't know how many patent cases
13  Your Honor has these days, I know it's in the
14  hundreds, but you'd be surprised about how many
15  of the Plaintiffs, for example, have what's
16  called contingency counsel that doesn't cost
17  them anything.  The idea that it would destroy
18  the company if they had to hire outside counsel
19  is really implausible at least to me when
20  there's a designation, when attorneys work on a
21  contingent basis all the time.
22           You asked a very interesting
23  question about -- because it's something that we
24  had discussed internally.  What if instead of

60

1  a competitive decision maker.  I like to make
2  recommendations to my clients.  Guess what?  I
3  don't decide for them.  They make the decision.
4  So when you've got outside counsel, sure they
5  work on licensing, but they don't make the
6  decisions.  And Ms. Verlander is the boss.
7  She's the one, the ultimate decision maker.  For
8  counsel to get up and say well, our model is
9  different and she doesn't make -- she's not a
10  competitive decision maker, I nearly fell out of
11  my chair.  There could be no one more a
12  competitive decision maker than Ms. Verlander.
13           And we heard that litigation
14  counsel is involved in licensing.  So, you know,
15  the issue was addressed clearly in that -- the
16  inquiry is the competitive decision makers are
17  precluded from seeing proprietary and
18  confidential information.  The only inquiry is
19  are they competitive decision makers and we just
20  heard they absolutely are.  So I don't think
21  it's -- right now, based on that, I don't think
22  it's a close call.
23           And the one case that was cited,
24  the Affymetrix case where as I understand

61

1  Affymetrix counsel, their trial unit was allowed
2  access, but interestingly enough, a company like
3  Affymetrix, their business is not procuring
4  patents and suing on them.  The litigation unit
5  litigates cases.  They don't go out there.
6  They've got a business to run.  Affymetrix is a
7  business.  So it's very different.  And in that
8  case, which wasn't mentioned, is that in
9  Affymetrix they have separate office space and
10 they have separate servers and it really
11 diminished the risk of inadvertent disclosure.
12 Here we heard a lot of them are in the same
13 office.  So it's not at all like Affymetrix.  If
14 at all, as we cited that case for, it's like the
15 situation in Illumina which precluded in-house
16 counsel involved in the competitive decision
17 making of settling patent litigation and
18 licensing, from previewing sensitive
19 information.  That's exactly what we have here.
20 And it has been confirmed.
21        And so I don't -- at this point in
22 time, I think that the Court's decision should
23 be to protect the Defendants proprietary
24 information and approve our version of the

63

1  Honor, but even so, you still then have to
2  balance the harm of excluding them.  Which even
3  if it's just them, would be severe, since that's
4  two of the three counsel who have appeared on
5  this case.  It's a large case, impossible to be
6  litigated by a single person.
7        THE COURT:  Seems to be your
8  business model.
9        MR. THOMPSON:  Well, I mean our
10 business model is to have I think more than one
11 litigator per case.  For example, here we have
12 three.  We envision adding more as we approach
13 trial.  But even still, I think you'd have to
14 balance the harms.  And the harms to Blackbird
15 would be extreme and the harms to Defendants
16 would be low, because we're not talking about
17 tremendously competitive sensitive information.
18 We're talking about information about LED bulbs
19 with the public visible structure.
20        And just two points on licensing
21 and acquisition, because I just want the record
22 to be clear.  We only license in the context of
23 litigation.  We are not doing licensing outside
24 of that context.  So it is true that litigators

62

1  protective order.  Thank you.
2        THE COURT:  All right.  Thank you.
3        MR. THOMPSON:  May I be heard,
4  Your Honor?
5        THE COURT:  Sure.  Yeah, go ahead,
6  Mr. Thompson.
7        MR. THOMPSON:  Briefly, Your
8  Honor.  The only inquiry is not competitive
9  decision making.  That's number one.  That's the
10 first part of the test.  If someone is a
11 competitive decision maker, you then must
12 balance the risks of inadvertent disclosure
13 against the harm from excluding that person.
14 And in the first place, still today we have not
15 heard any counsel by counsel analysis as to who
16 is a competitive decision maker in Blackbird.
17 That's Defendants' burden.  They haven't met it.
18        THE COURT:  You know, based on
19 what has been said here in terms of facts, I'm
20 pretty sure that there's no doubt that Ms.
21 Verlander and Mr. Freeman are competitive
22 decision makers.  And I mean, that does not seem
23 to be reasonably subject to dispute.
24        MR. THOMPSON:  Understood, Your

64

1  are involved in the immediate run up to
2  litigation in seeing if a Defendant would take a
3  license, but I would suggest that's very common
4  for outside counsel to do that.  And you know,
5  under our approach, we would already have filed
6  the complaint before sending the letter to the
7  Defendant to see if they would take a license.
8  So I don't think it's exceptional that
9  litigators are involved in licensing.  I think
10 that's very common in the specific context of
11 licensing.  We're not talking about licensing
12 campaigns outside of the litigation context.
13        And Your Honor, I point out that
14 in the Philips case we cite, those litigators
15 were also involved in licensing and still they
16 receiving access to a direct competitor's
17 confidential information.
18        And as to acquisition, again, I
19 just want to be entirely clear as to how our
20 model works.  We have patent analysts who would
21 never see this information taking a first look
22 at patents, then goes up to another lawyer who
23 would not see this information and only then
24 would those patents ever even come to the desk

65

1  of Ms. Verlander.
2          THE COURT:  I guess on that point,
3  Mr. Thompson, I don't really understand what
4  your underlying point is.  It seems to be --
5          MR. THOMPSON:  I can clarify, Your
6  Honor.
7          THE COURT:  Okay.
8          MR. THOMPSON:  If you had the
9  patent analysts who were out there trying to
10 find these patents with this knowledge, I could
11 see the argument that yes, maybe they could
12 improperly use it to determine which patent we'd
13 even look at.  But they don't have that now.
14 They are making those decisions completely
15 irrespective of the knowledge obtained in these
16 cases.  So by the time it gets up to the level
17 of someone who may, may have knowledge derived
18 from one of these cases, the likelihood of their
19 knowledge being even relevant to the patents
20 under consideration is tremendously low.
21 Literally a patent analyst would have to
22 randomly come across an LED patent, the second
23 level would have to prove it and only then would
24 it go to Mr. Freeman and Ms. Verlander.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

67

1  to do with Defendants' products and we're not
2  going to be seeing any information about it.
3  And our ability to acquire those patents would
4  be severely hampered by that type of bar here.
5  And really, ultimately, we're not talking about
6  hundreds of patents coming up to Ms. Verlander
7  and Mr. Freeman for review.  It's a very, you
8  know, single, low double digit list that they
9  take a look at and make a final decision about,
10 from a litigation perspective, as to whether
11 that is something we'll pursue.
12          Just as a practical matter, their
13 ability or even possibility of getting anything
14 to use from this suit, or any suit, to make that
15 decision is very low.  And that's why the
16 acquisition in context is just much less
17 competitively concerning.  Again, prosecution --
18          THE COURT:  I think, Mr. Thompson,
19 you've used up your time here.
20          MR. THOMPSON:  Thank you, Your
21 Honor.
22          THE COURT:  Okay.  All right.  So
23 I take it -- is there anything either side wants
24 to submit?  I'm not saying you should or but I'm

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

66

1          THE COURT:  But you know that
2  argument is really saying then there's no harm
3  in keeping you out of that line of work.
4          MR. THOMPSON:  I'm sorry, could
5  you repeat that, Your Honor?  I apologize.
6          THE COURT:  That's all right.
7  Your argument is there's no harm of keeping us
8  out of this line of acquisition because it could
9  never happen?
10          MR. THOMPSON:  I think if what was
11 entered was a bar preventing them from being
12 involved in acquisition of LED patents, for
13 example, I'm just theoretically saying that's
14 the scope of the bar, I think we'd have to
15 entirely exit that industry, because the reality
16 is there'd be no decision maker with their --
17          THE COURT:  You showed me your
18 industries are, you know, baby carriages --
19          MR. THOMPSON:  Varied.  That's
20 right, it is.
21          THE COURT:  There are a lot of
22 industries out there.
23          MR. THOMPSON:  There are, but
24 there's a lot of LED patents that have nothing

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

68

1  just wondering is there anything that either of
2  you want to submit after this argument or are
3  you content now to just let me decide this?
4          MR. THOMPSON:  We'd be happy to
5  submit affidavits detailing what each person's
6  role is in the company in a very specific way
7  for Your Honor, which perhaps would be helpful
8  to you.
9          THE COURT:  Well, when you say
10 each person, you mean you, Ms. Verlander and Mr.
11 Freeman?
12          MR. THOMPSON:  Or anyone else you
13 might want to hear from.
14          THE COURT:  I don't think anyone
15 else is particularly an issue.  Mr. Rovner, what
16 do you think about that?
17          MR. ROVNER:  Well, I think that
18 the time to do that was when letters were
19 required to be submitted.  I also don't
20 understand why in the world we would need that
21 when we can check the record, the transcript,
22 when we've already learned that Ms. Verlander
23 and the rest of the litigation team are
24 responsible for licensing.  So I don't

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

69

1  understand what else there would be.  And I
2  just -- I would -- you can't, you know, unring
3  the bell.  That's what was said to us.
4       THE COURT:  Well, so here's the
5  thing.  Here's part of the reason why I ask, is
6  you know, I have a lot of these disputes, and,
7  you know, I have the impression that when the --
8  and I think this may actually be the impression
9  based on fact, but I could be wrong, that when
10 they had the Deutsch Bank case, I think the
11 judge there had some hearings, took evidence, a
12 lot of the things the Federal Circuit says
13 sounds like evidence.  And usually when I get
14 these things, there's a lot of argument and not
15 much evidence.  So I'm perfectly happy to let
16 Ms. Verlander, Mr. Freeman and Mr. Thompson, if
17 you want to, yourself, though -- well, it's up
18 to you, so today is Thursday.  I think you can
19 do these by Monday.
20      MR. THOMPSON:  That's fine, Your
21 Honor.
22      THE COURT:  All right.  I'll be
23 happy to get whatever it is you want to submit
24 and Mr. Rovner, I take it there's nothing more

71

1  if these were going to be terribly lengthy
2  affidavits.  You know, I'm not interested in
3  where Mr. Thompson went to law school, so I
4  expect the affidavits will be focused on what
5  we've been talking about or whatever else
6  Blackbird might think was germane.  But you
7  know, we can skip the paragraphs about them
8  being competent adults.  I understand they are.
9  Okay.
10      MR. ROVNER:  Your Honor, just one
11 other thing.  I might as well while I'm up.  In
12 our letter we attached as Exhibits E through M,
13 the bios of Blackbird principles and we urge
14 Your Honor to look at those because I think they
15 are telling as well.
16      THE COURT:  Okay.  Well, you know,
17 if you -- I did look at them briefly, so okay.
18      MR. THOMPSON:  Your Honor, if I
19 could point out just limited on those bios,
20 those described what each of us did before we
21 came to Blackbird, not after, which is
22 irrelevant to the analysis.
23      THE COURT:  I'll tell you what.
24 You submit your things by Monday, Mr. Thompson.

70

1  you want to submit, right?
2       MR. ROVNER:  Well, I would like
3  the opportunity, obviously, to comment on what
4  we receive.
5       THE COURT:  That's a slightly
6  different thing.  But in terms of evidence,
7  there's nothing more you want to submit, right?
8       MR. ROVNER:  No, there's no need
9  for us to, in my opinion.  I just urge Your
10 Honor to read the U.S. Steel case.
11      THE COURT:  Yeah, yeah, yeah.
12 Argument time is over.
13      MR. ROVNER:  Okay.
14      THE COURT:  So here's the thing is
15 within 48 hours of whenever they submit their
16 declarations or affidavits, whatever they may
17 be, if you think it's appropriate to comment on
18 them, you can send me a letter, you know, no
19 more than two pages, okay?
20      MR. ROVNER:  Well, that's fine --
21 whatever you say, Your Honor.  If we have to
22 respond to lengthy affidavits -- I hope we
23 don't.
24      THE COURT:  Well, I'd be surprised

72

1  Mr. Rovner, if you feel the need to have three
2  pages, you can have three pages to comment.
3  Better be world class commentary, though, okay?
4       MR. ROVNER:  We have to define
5  world class, but thank you, Your Honor.  I
6  understand.
7       THE COURT:  All right.  Well, I
8  think, you know, there's a very interesting
9  issue here, so I am going to take it under
10 advisement.  I would take it under advisement
11 even if you had nothing more to submit and I'm
12 not sure what I'm going to do, so submit your
13 stuff and once I have all the stuff, it is high
14 on my list to actually get some order out that I
15 doubt will be very long, but I don't expect to
16 just cross out things on the protective order.
17 I expect to write at least a few paragraphs
18 explaining however it is I've digested all of
19 what I've heard and what I will hear.  Okay.
20      MR. ROVNER:  Thank you, Your
21 Honor.
22      (End at 3:25 p.m.)
23
24

1  State of Delaware)
                )
2  New Castle County)

3
4
5       <u>CERTIFICATE OF REPORTER</u>
6
7       I, Stacy M. Ingram, Certified Court Reporter
8  and Notary Public, do hereby certify that the
9  foregoing record, Pages 1 to 73 inclusive, is a true
10 and accurate transcript of my stenographic notes
11 taken on May 5, 2016, in the above-captioned matter.
12
13      IN WITNESS WHEREOF, I have hereunto set my
14 hand and seal this 5th day of May 2016, at
15 Wilmington.
16
17
18      <u>*/s/ Stacy M. Ingram*</u>
19      Stacy M. Ingram, CCR

20
21
22
23
24

        Hawkins Reporting Service
    715 North King Street - Wilmington, Delaware  19801
        (302) 658-6697  FAX (302) 658-8418

# EXHIBIT B

ACI Automotive Forum - Trifecta for Automotive: Clients, Judges & NHTSA, Top Firms in Chicago 6/9 | **Read More »**



# Wendy Verlander
President and CEO at Blackbird Technologies
Boston, Massachusetts | Law Practice

2nd

| | |
|---|---|
| Previous | WilmerHale, Pennie & Edmonds LLP, Fish & Richardson P.C. |
| Education | Columbia University School of Law |

**Connect**    **Send Wendy InMail**  ▾

**450**
connections

https://www.linkedin.com/in/wendy-verlander-9a27341

### Background

 Summary

I am a founder of Blackbird Technologies, a unique business model helping inventors and small companies realize the value of their patents. I have more than 20 years of experience working with companies at all stages of development and growth, and in all aspects of intellectual property.

I have developed and implemented intellectual property strategies suited for companies from startups to established Fortune 50 businesses. I have broad experience in intellectual property litigation, representing clients in federal district court and appellate disputes, and International Trade Commission (ITC) actions. I have regularly counseled clients on strategies relating to domestic and foreign patent procurement, post-grant Patent Office proceedings, portfolio reviews and competitive analyses. I also have experience with opinions, licensing and transactions.

I have successfully litigated cases for some of the largest technology companies in the world over a wide range of technologies, including electronics, optoelectronics and semiconductor manufacturing, MEMs, mechanical and medical devices, wireless communications technology and standards, mobile devices and applications, microprocessor technology, television transmission systems and standards, engine systems and methods of doing business.

I have a long history of pro bono service and have regularly represented indigent clients on various intellectual property matters.

 Experience

**President and CEO**
Blackbird Technologies
2014 – Present (2 years) | Boston, MA

**Senior Partner**
WilmerHale
2004 – 2014 (10 years) | Boston, MA

**Junior Partner**
WilmerHale
2001 – 2004 (3 years) | Boston, MA

**Associate**
Pennie & Edmonds LLP
1994 – 2001 (7 years) | New York, NY

**People Similar to Wendy**



**Dinesh Agarwal** 3rd
Patent & IP Attorney at Dinesh Agarwal, P.C.
Connect

**Peggy Styer**
--

**James Dunne**
Vice President at Blackbird Technologies Inc

**Lindsay Rogers, CIR, CSSR**
Corporate Recruiter at Raytheon Blackbird Technologies, Inc.

**Denise Ferugio, CSSR**
Talent Acquisition Director and Human Capital Strategist

**Torsten Staab, PhD**
Chief Technology Officer at Raytheon Blackbird Technologies, Inc.

**Brian W Hobbs**
Vice President Corporate Capture

**Ann Kohudic**
Senior Recruiter at Blackbird Technologies, Inc.

**How You're Connected**

You

BRYAN SUGAR





# EXHIBIT C

Case 1:15-cv-00053-RGA   Document 51-1   Filed 05/24/16   Page 26 of 31 PageID #: 773

Job Offers. No resume. - Create your Hired profile for companies to start applying to hire you. | **Read More »**



# Chris Freeman   2nd

Vice President and Head of Litigation at Blackbird
Technologies

Boston, Massachusetts | Law Practice

| | |
|---|---|
| Previous | Kirkland & Ellis LLP, Quinn Emanuel, Latham & Watkins |
| Education | Boston University School of Law |

**Connect**   **Send Chris InMail**   ▼

**500+**
connections

https://www.linkedin.com/in/chris-freeman-316ab3

## People Similar to Chris

‹ ›

**Mimi ("MR") Rupp**  2nd
Vice-President, Associate General Counsel - l...
Connect

---

## Background



## Summary

Business-focused intellectual property litigator with a track record of success at the highest levels of patent and trademark litigation, representing, as both plaintiff and defendant, a broad range of clients from technology start-ups and privately held businesses, to Fortune 100 Corporations. Adept at building and managing client relationships by developing a deep understanding of the true business objectives driving litigation. Proven ability to work collaboratively with clients and colleagues to achieve goals and favorable results. Credentials include double B.S. in Engineering and Economics from Northwestern University, and a J.D. magna cum laude from Boston University.



## Experience

### Vice President and Head of Litigation
Blackbird Technologies
July 2014 – Present (1 year 11 months)



Chris Freeman is a founding member of Blackbird Technologies. In his nearly 10 years of experience working with technology-focused companies, he has litigated patent cases in a wide variety of technologies in front of U.S. District Courts, the U.S. Patent and Trademark Office, and the U.S. International Trade Commission. Mr. Freeman honed his skills at some of the top IP Litigation law firms in the country before bringing his litigation expertise to Blackbird Technologies in July 2014.

### Partner
Kirkland & Ellis LLP
August 2011 – June 2014 (2 years 11 months) | Chicago



Manage all aspects of high-stakes intellectual property litigation, including supervising outside experts, internal team, including attorneys, paralegals, and support staff, and coordinating with clients, inventors, and co-defendants; drafting dispositive motions, summary judgment briefs, and claim construction briefs; taking and defending numerous depositions, including inventors, key witnesses, and corporate representatives; drafting and managing the negotiation and execution of settlement agreements and intellectual property licenses.

### Associate
Quinn Emanuel
March 2009 – July 2011 (2 years 5 months) | Chicago



Opened Chicago office with team from previous firm; counseled clients directly regarding litigation strategy and tactics; argued numerous motions in court and assisted in claim construction hearings; defended and took depositions, including depositions of corporate representatives.

### Associate
Latham & Watkins

## People You're Connected / Similar

**David Gerasimow**
Senior Litigation Counsel at Blackbird Technologies

**James Dunne**
Vice President at Blackbird Technologies Inc

**David Callahan**
Intellectual Property Trial Lawyer at Latham & Watkins LLP

**Daniel Harris**
Counsel, Patent Analysis Group at Blackbird Technologies

**Deborah Colella Yates**
Senior Litigation Counsel at Blackbird Technologies

**Peter Verlander**
Founder, CSO at Provia Laboratories

**Vineet Vallam**
Patent Analyst at Blackbird Technologies

## How You're Connected

You

BRYAN SUGAR

Ask BRYAN for an introduction ›

Case 1:15-cv-00053-RGA   Document 51-1   Filed 05/24/16   Page 27 of 31 PageID #: 774



motions; researched and drafted complaints, answers, and other pleadings in complex
litigation; assisted in Bankruptcy practice, including research, drafting, and client counseling.

Chris Freeman

**Career Peer**
Boston University School of Law
2007 – 2007 (less than a year)

**Project Manager**
Epic
August 2002 – July 2004 (2 years)

Managed the implementation of integrated healthcare software solutions designed for hospitals and
health care organizations throughout the U.S.; consulted with clients on configuration decisions to help
tailor the system to their needs; contributed to the future development of healthcare software
applications; led internal workgroup responsible for implementation methodology improvements; and
coordinated customer focus groups to facilitate software improvement.

Skills

| 6 | Trademark Infringement | |
| 4 | Litigation | |
| 3 | Intellectual Property | |
| 2 | Legal Writing | |
| 2 | Legal Research | |
| 1 | Patents | |
| 1 | Trials | |
| 1 | Courts | |
| | Bankruptcy | |

Education

**Boston University School of Law**
JD
2004 – 2007

**Northwestern University**
BS, Engineering
1998 – 2002

**catholic memorial**

Connections                                              Shared (4)

BRYAN SUGAR  1st                    Jennifer Bauer  1st
Co-Chair of Firmwide Intellectual Proper...   Associate at Quinn Emanuel

Khurram Naik  1st                   Tiffany Cunningham  1st



Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2016 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

# EXHIBIT D

61 New Colorado Clients - 61 new legal clients seeking a Colorado attorney. View their cases today. | **Read More »**



# Sean Thompson 3rd

Senior Litigation Counsel at Blackbird Technologies
Boston, Massachusetts | Law Practice

| | |
|---|---|
| Previous | WilmerHale, Cravath, Swaine & Moore LLP |
| Education | Cornell Law School |

**Send Sean InMail** ▼

**224**
connections

https://www.linkedin.com/in/sean-thompson-640a4a97

## Background

### Experience

**Senior Litigation Counsel**
Blackbird Technologies
February 2016 – Present (4 months) | Boston, MA

**Counsel**
WilmerHale
2012 – February 2016 (4 years) | Boston, MA

Intellectual Property Litigation

**Litigation Associate**
Cravath, Swaine & Moore LLP
August 2005 – December 2011 (6 years 5 months)

### Education

**Cornell Law School**
Doctor of Law (J.D.)
2002 – 2005

**The London School of Economics and Political Science (LSE)**
Master of Science (MSc), International Relations
2001 – 2002

**Boston College**
Bachelor of Arts (B.A.), Philosophy and Political Science
1997 – 2001

### People Similar to Sean

**Joshua Stern** 3rd
Counsel at WilmerHale
Connect

### Ads You May Be Interested In

**Job Offers. No resume.**
Create your Hired profile for companies to start applying to hire you.

**61 New Colorado Clients**
61 new legal clients seeking a Colorado attorney. View their cases today.

**In-house Counsel?**
Free 30-day trial membership to the world's largest in-house community.

**David Gerasimow**
Senior Litigation Counsel at Blackbird Technologies

**Wendy Verlander**
President and CEO at Blackbird Technologies

**Vineet Vallam**
Patent Analyst at Blackbird Technologies

**William Burroughs**
Owner

**Sara Greengrass**
Foreign Service/Politics/Law

**Wayne Kennard**
Co-Founder of Sankofa, Inc. and retired Partner at WilmerHale LLP

**Brian Driscoll**
Associate at WilmerHale

### How You're Connected

You

BRYAN SUGAR

